**FILED**

AUG 3 0 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN LaFLAMBOY,

        Plaintiff,

vs.

STEVEN LANDEK, individually and as Village
Mayor; KENNETH DeVRIES; STEVEN
REYNOLDS; ADRIANA MAZUTIS;
FRED PASCENTE; VINCENT CAINKAR,
individually and as Attorney for the Village;
JOHN CURRY, individually and as Building
Inspector for the Village; JOSEPH KAPUT,
individually and as Building Inspector for the
Village; BUTCH SLOAN, individually and as
employee of the Village Police Department;
and ALAN GUSTAFSON,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Jury Trial Demanded

No. **05C 4994**

JUDGE AMY ST. EVE

MAGISTRATE JUDGE COLE

## COMPLAINT FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND FOR OTHER RELIEF

NOW COMES the Plaintiff, JOHN LaFLAMBOY, by and through his attorneys, DENNIS

A. BERKSON, MICHAEL D. ETTINGER, and RICHARD S. ZACHARY, and complaining of the

Defendants, states as follows:

### COUNT ONE
### (Civil RICO Complaint)

### JURISDICTION AND VENUE

1.    This court has jurisdiction under 15 U.S.C. § 26 and 28 U.S.C. § 1337.

2.    Venue is proper in the Northern District of Illinois because the Plaintiff resides in this

district, each Defendant is found in this district and the events in question took place here.

## THE PARTIES

3.     Plaintiff John LaFlamboy (hereinafter "Plaintiff") individually, being the previous co-owner of a sports facility and events venue formerly known as The World Golf Dome, located within the Village of Bridgeview, County of Cook, Illinois.  Said facility will be hereafter referred to as the "World Golf Dome" or "WGD".

4.     Steven Landek, defendant, is the Mayor of the Village of Bridgeview.

5.     Kenneth DeVries, defendant, individually.

6.     Steven Reynolds, defendant, individually.

7.     Adriana Mazutis, defendant, individually.

8.     Fred Pascente, defendant, individually.

9.     Vincent Cainkar, defendant, is the attorney for the Village of Bridgeview.

10.     John Curry, defendant, is a building inspector for the Village of Bridgeview.

11.     Joseph Kaput, defendant, is a building inspector for the Village of Bridgeview.

12.     Butch Sloan, defendant, is a member of the Bridgeview Police Department.

13.     Alan Gustafson, defendant, individually.

## GENERAL ALLEGATIONS

### A.     The World Golf Dome

14.     The World Golf Dome, now known as the Bridgeview Sports Dome, is located southeast of the intersection of 89th Street and 77th Avenue in Bridgeview, Illinois.  The first indoor driving range in the Southland area, the WGD was envisioned, planned, and developed by the Plaintiff, who purchased the site for the facility in March of 1998, commenced construction of the WGD in June of 1999, and invested substantial savings in the project.  The WGD opened for

2

business in November of 1999, and featured an inflatable dome with a 75-foot ceiling height, in which golf, soccer, softball, and other activities could be conducted throughout the year. The WGD included a clubhouse bar, a pro shop, and a parking lot; and presented live concerts and a Halloween-related "haunted house" in addition to its other features. Through a land trust, the Plaintiff was 50% owner of the WGD; the remaining 50% was owned by the defendant Alan Gustafson. Of the two partners, it was the Plaintiff who was involved in the day-to-day operation and management of the WGD, just as it was the Plaintiff who had solely envisioned and developed the WGD, from its formation as a concept, to the purchase of a site for the facility, to and through the construction of the dome and its opening to the public on November 11, 1999.

15.     From its opening in November of 1999 to September of 2003, the Plaintiff retained his ownership share of the WGD, and remained in control of the facility. On or about September 15, 2003, however, the Plaintiff was wrongfully divested of his ownership of the WGD, this being the result of a pattern of illegal, fraudulent, and racketeering acts by the defendants in the course of a Racketeering Conspiracy which is described below. In furtherance of the Racketeering Conspiracy, the defendants operated a three-part ENTERPRISE (hereinafter "Enterprise") within the meaning of the civil RICO Act, which was engaged in, and which affected, interstate commerce, consisting of (i) the Village of Bridgeview; (ii) the Office of the Mayor of the Village of Bridgeview; and (iii) an Association in Fact of the defendants Landek, DeVries, Reynolds, Mazutis, Pascente, Cainkar, Curry, Kaput, Sloan and Gustafson. Each defendant exercised a degree of direction over the Enterprise's affairs and/or played a role in its operation, management or control.

16.     The "paper trail" of the Racketeering Conspiracy is a complicated one, since the defendants took pains to shield their scheme from public exposure and possible criminal prosecution.

3

As will be made clear, the defendants' primary goal was to facilitate the acquisition of the WGD by the Village of Bridgeview, which required (i) divesting the Plaintiff of his ownership and control of the facility; and thereafter (ii) vesting the Village with ownership of the WGD in a manner that would appear "legitimate" while guaranteeing monetary rewards for the members of the conspiracy. The ultimate goal of the defendants, including Village Mayor Landek, was to use the WGD, once wrested from the Plaintiff's control, as a means of enticing the Chicago Fire professional soccer team to choose the Village for its home stadium site. As of the current date, the defendants have managed to achieve each of the foregoing goals of their scheme. By and through the Racketeering Conspiracy, the defendants have been able to bring about (1) the divestiture of the Plaintiff's ownership of the WGD (effective as of September 15, 2003); (2) the Village's subsequent acquisition of the WGD (effective as of November 26, 2003); (3) the paying of proceeds in excess of $242,000 to various persons for their roles in the scheme; and (4) the winning of the competition, by the Village, to become the host community for the Chicago Fire—a quartet of racketeering-related "accomplishments" which were the fruits of fraud, obstruction of justice, official misconduct, and other crimes. The means, methods and stages of the Racketeering Conspiracy are set forth below. As a consequence of the wrongful acts committed by the defendants, the Plaintiff has suffered losses to his business and property in excess of $6 million, and brings this action under the provisions of the civil RICO Act (18 U.S.C § 1961 *et seq.*) for such relief as he may be entitled to under law.

**B.  Additional Factual Background**

17.     At all times material to this Complaint:

A.     The Village of Bridgeview (also the "Village") was a municipal corporation and political subdivision of the State of Illinois, located about 15 miles southwest of Chicago, with

4

a population of approximately 15,000.

  B. The Office of the Mayor of Bridgeview ("Mayor's Office") was a local governmental and municipal department entrusted with comprehensive duties involving, among other things, appointing department directors, supervisors and administrators; overseeing the actions of the Board of Trustees for the Village; overseeing the actions of the attorney for the Village; supporting, approving and vetoing local legislation; overseeing the actions of the Commissioners and Inspectors of the Village; proposing, supporting, and approving the use of Village funds for public purposes; and otherwise setting priorities and direction for the Village.

  C. Defendant Steven Landek ("Landek") was elected to a four-year term as Mayor of the Village of Bridgeview in April of 1999, and was re-elected to a second term in April of 2003.

  D. Defendant Kenneth DeVries ("DeVries") was the owner of The Scoreboard, Ltd. (the "Scoreboard"), the clubhouse bar and restaurant located on the premises of the WGD. On September 30, 1999, De Vries signed a five-year lease with the Plaintiff for the tenancy of said premises, having been recommended for such opportunity by Landek.

  E. Defendant Steven Reynolds ("Reynolds") was an adviser to Village Mayor Landek and a former employee of the Village of Bridgeview and of the Cook County Forest Preserve District.

  F. Defendant Adriana Mazutis ("Mazutis") was the business partner and fiancee of Reynolds.

  G. Defendant Fred Pascente ("Pascente") was a personal associate of Reynolds and was a former Chicago police officer and convicted felon.

H.    Defendant Vincent Cainkar ("Cainkar") was an attorney and a member of the law firm of Louis F. Cainkar, Ltd., in Burbank, Illinois. In May of 1999, Cainkar's law firm was appointed by Landek to the position of the attorney for the Village, in which capacity Cainkar personally performed various services for Landek.

I.    Defendant John Curry ("Curry") was appointed by Landek to the position of Director of Building Inspection Services for the Village in May of 1999. In May of 2001, Curry was re-assigned by Landek to the position of Code Enforcement Inspector for the Village.

J.    Defendant Joseph Kaput ("Kaput") was appointed by Landek to the position of Director of Building and Inspection Services in May of 2001.

K.    Defendant Butch Sloan ("Sloan") was a police officer employed by the Village of Bridgeview.

L.    Defendant Alan Gustafson ("Gustafson") was a former business associate of the Plaintiff, and was 50% owner of the WGD prior to obtaining full ownership of the WGD through racketeering-related acts which are set forth below.

Organized Crime Involvement

M.    Defendant Pascente was reputed to be associated with organized crime in the Cook County area, and used his organized-crime-related reputation to threaten, intimidate and coerce various individuals, including the Plaintiff, in the course of his involvement in the Racketeering Conspiracy as set forth below.

C.    **The Racketeering Conspiracy**

18.    Beginning in approximately May of 1999, and continuing until February of 2004 and thereafter, in the Village of Bridgeview and elsewhere, in the Northern District of Illinois, Eastern

6

Division, the defendants Landek, DeVries, Reynolds, Mazutis, Pascente, Cainkar, Curry, Kaput,
Sloan and Gustafson, being persons employed by and associated with an enterprise engaged in, and
the activities of which affected, interstate commerce, namely, the Enterprise, did conspire with each
other and with other persons unknown at this time, to violate 18 U.S.C. § 1962(c), that is, to conduct
and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a
pattern of racketeering activity consisting of multiple acts indictable under the following provisions
of federal law:

      (a)    18 U.S.C. § 1503 and § 1512 (obstruction of justice);

      (b)    18 U.S.C. § 1951 (extortion);

      (c)    18 U.S.C. § 1341 (mail fraud);

      (d)    18 U.S.C. § 1343 (wire fraud);

and numerous criminal acts chargeable under the laws of the State of Illinois, namely 720 ILCS 5/8-
2.1 (conspiracy against civil rights), 720 ILCS 5/33-1 (bribery), 720 ILCS 5/33-3 (official
misconduct), 720 ILCS 5/32-2 (perjury), 720 ILCS 5/32-3 (subornation of perjury), and 720 ILCS
5/17-3 (forgery).

    19.    It was part of the Racketeering Conspiracy that the defendants agreed that a
conspirator would commit at least two acts of racketeering in the conduct of the affairs of the
Enterprise. The chief purpose of the Racketeering Conspiracy was to exert wrongful, illegal and
fraudulent pressure upon the Plaintiff to force him to sell, transfer, or be otherwise divested of his
ownership interest in the World Golf Dome, in order to facilitate the acquisition of the WGD by the
Village of Bridgeview. In order to accomplish this purpose, the defendants utilized various means
and methods, including (i) the issuance of disingenuous and unfounded tickets, citations and

7

injunctions against the WGD; (ii) the orchestration of a campaign of bogus lawsuits against the WGD; (iii) the arrangement of surreptitious dumping of garbage and other items on the premises of the WGD; (iv) the use of the United States mails for correspondence in support of the scheme; (v) the subjection of the Plaintiff to physical intimidation and other "strong-arm" tactics, by individuals with criminal backgrounds, who represented that they had organized-crime connections; and (vi) the forging of the Plaintiff's signature on a "settlement agreement" dated September 15, 2003, which purported to transfer the Plaintiff's ownership interest in the WGD to his erstwhile partner, defendant Gustafson.

20.     Other Goals of the Conspiracy.   In addition to their goal of divesting the Plaintiff of his ownership of the WGD, the defendants intended to, and did, operate the Enterprise for the additional purpose of obtaining wrongful and illegal financial gains for themselves, including (i) the skimming of unreported "political donations" from the proceeds of music concerts staged at the WGD, with such proceeds surreptitiously turned over to Landek for his personal benefit; and (ii) the payment of $242,367 by the Village to co-conspirator Mazutis for her role in the scheme. Moreover, the defendants, including Village Mayor Landek, also operated the Enterprise for the purpose of enticing the Chicago Fire to choose Bridgeview for its home, by utilizing the former World Golf Dome as a practice facility for the Fire. The defendants also used the Enterprise to conceal and protect their foregoing goals from public exposure and possible criminal prosecution.

D.     Means and Method of the Conspiracy:

21.     It was part of the conspiracy that the defendants Landek, DeVries, Reynolds, Mazutis, Pascente, Cainkar, Curry, Kaput, Sloan and Gustafson engaged in a fraudulent, wrongful and illegal scheme to force the Plaintiff to sell, transfer, assign, or otherwise be divested of his interest in the

WGD, in order to facilitate the acquisition of the same by the Village of Bridgeview.

22.    It was a further part of the conspiracy that the defendants used the United States mails, faxed communications, telephonic communications, internal memoranda, public and private monies, official procedures and penalties, sworn documents and other means and procedures to accomplish the foregoing scheme.

23.    It was a further part of the conspiracy that Landek acted in his official capacity as Mayor at all times and otherwise exploited the powers, prerogatives and privileges afforded by the Mayor's Office in seeking to succeed in the foregoing scheme.

24.    It was a further part of the conspiracy that, in or about May of 1999, Landek instructed Curry, either personally or through an agent of the Enterprise, to begin a campaign of harassment of the Plaintiff, in his official capacity as a Village Building Inspector.

25.    It was a further part of the conspiracy that Curry proceeded to disrupt the operation of the WGD on several occasions with picayune and unfounded warnings, citations and injunctions, in order to make it increasingly difficult for the Plaintiff to retain ownership of the WGD and earn his livelihood from the same.

26.    It was a further part of the conspiracy that, in or about November of 1999, Landek instructed Sloan, either personally or through an agent of the Enterprise, to begin a campaign of harassment of the Plaintiff, in his capacity as a member of the Village Police Department.

27.    It was a further part of the conspiracy that Sloan and his fellow officers proceeded to write approximately twenty tickets against the WGD for purported "violations" of various ordinances, these tickets being issued for no proper purpose, resulting in no convictions and being intended solely to disrupt the Plaintiff in his attempt to successfully operate the WGD.

9

28. It was a further part of the conspiracy that Landek instructed agents of the Enterprise and otherwise arranged to have garbage, pieces of concrete, loads of dirt, tree trunks and other items surreptitiously dumped upon the premises of the WGD, in order to further hinder Plaintiff in his attempts to run his business and make a living.

29. It was a further part of the conspiracy that, in or about August of 1999, Landek promoted the candidacy of his personal friend and co-conspirator DeVries for tenancy on the premises of the WGD as the operator of its clubhouse bar (the "Scoreboard"). The two conspirators arranged and planned that DeVries, once established as Plaintiff's tenant, would be maximally uncooperative and antagonistic, increasing the likelihood that Plaintiff would be forced to eventually surrender ownership of the WGD to the Village.

30. It was a further part of the conspiracy that Landek proceeded to authorize and arrange that DeVries be allowed by the Village to build a beer garden on the premises of the WGD and to stage special events on its premises without being required to obtain the permits otherwise required by law.

31. It was a further part of the conspiracy that DeVries proceeded to arrange for certain "political donations" to be skimmed from the proceeds of special events subsequently staged at the WGD, including the "Tattoo the Earth" concert of July 26, 2000, with such "donations" (running into thousands of dollars) turned over to Landek for the latter's personal benefit.

32. It was a further part of the conspiracy that DeVries proceeded to encourage, abet and pay certain individuals to file bogus lawsuits against the Plaintiff, in order to further disrupt the Plaintiff's ability to earn his livelihood through the WGD and retain his control of the facility.

33.     It was a further part of the conspiracy that DeVries refused to pay the taxes and utilities incurred by the Scoreboard bar, refused to allow the Plaintiff to gain access to the premises in order to inspect certain building code "violations" therein, was otherwise antagonistic and uncooperative in his relationship with the Plaintiff.

34.     It was a further part of the conspiracy that, in or about October of 2000, Landek met with Cainkar and otherwise agreed and arranged that Cainkar would obtain a market value appraisal of the WGD, for the purpose of ascertaining the value of the property that the conspirators were seeking to wrest from Plaintiff's ownership and control.

35.     It was a further part of the conspiracy that, on November 1, 2000, acting in his capacity as attorney for the Village, Cainkar had the WGD appraised by a private real estate appraiser, and thereafter conferred with Landek regarding the written analysis prepared by the appraiser.

36.     It was a further part of the conspiracy that DeVries orchestrated a campaign of harassment of the patrons of the "Haunted House" which the Plaintiff (assisted by his son, John LaFlamboy, Jr.) presented at the WGD; and that De Vries and Reynolds thereafter impounded the equipment used for this project and refused to permit the Plaintiff to regain possession of the same.

37.     It was a further part of the conspiracy that, in or about January of 2003, Landek instructed Kaput, either personally or through an agent of the Enterprise, to begin a campaign of harassment of the Plaintiff, in his official capacity as a Village Building Inspector.

38.     It was a further part of the conspiracy that, on or about March 10, 2003, Kaput commenced a series of purported inspections of the WGD, accompanied by Curry, Sloan and other agents of the Enterprise, these inspections being disingenuous in their stated purpose and being

11

intended, in fact, to disrupt the operation of the WGD, in order to make it further difficult for the Plaintiff to earn a living and retain his ownership and control of the facility.

39.     It was a further part of the conspiracy that, in or about August of 2003, Landek conferred with Reynolds, Pascente, Gustafson and Mazutis, and otherwise agreed and arranged that the Plaintiff would be subjected to mafia-style intimidation in order to force him to sign over his interest in the WGD.

40.     It was a further part of the conspiracy that, on or about September 10, 2003, without the Plaintiff's knowledge or consent, Gustafson sent his attorney, Thomas Morrison, a letter stating that the corporate books and stock certificates of the WGD were to be turned over to Reynolds, as a preliminary step to the impending divestiture of Plaintiff's ownership of the WGD by force or by fraud.

41.     It was a further part of the conspiracy that, on September 12, 2003, Reynolds, Pascente and a hulking accomplice visited the WGD, armed with revolvers and intending to utilize threats of physical violence to force the Plaintiff to sign over his ownership of the WGD.

42.     It was a further part of the conspiracy that, on September 12, 2003, upon arriving at the WGD and learning from a female employee that Plaintiff was temporarily absent, the three conspirators physically abused the employee, brandished their weapons in front of her, forced her into their automobile against her will, and threatened to commit acts of violence upon Plaintiff, the employee and her family unless Plaintiff came to the WGD to "negotiate" with them, terrifying the employee and causing her to call the police.

43.     It was a further part of the conspiracy that, after the police were summoned to the WGD by the "911" call, Reynolds called Landek on a cell phone and asked for advice as to how to

12

handle the situation; whereupon Landek "explained" to the employee (via the cell phone) that Reynolds and Pascente were there on his behalf, and "that everything would be all right" if the Plaintiff cooperated with his representatives.

44.     It was a further part of the conspiracy that Landek proceeded to confer with the members of the Village Police Department who had answered the employee's "911" call, and told them to desist from further involvement in the situation and to leave the scene; with which directives the police officers complied.

45.     It was a further part of the conspiracy that, during the evening of September 12, 2003 (after Plaintiff had been "persuaded" by Reynold's and Pascente's threats of impending retribution to meet with them at the WGD), Reynolds, Pascente and their hulking accomplice, armed with revolvers, managed to coerce the Plaintiff into signing away his interest in the WGD to Pascente for the preposterously low amount of $175,000.

46.     It was a further part of the conspiracy that, having coerced the Plaintiff into selling his interest in the WGD for a pittance, Pascente never paid the Plaintiff a penny in consideration of such "sale," in keeping with the methods of a seasoned criminal who does business with a gun in hand.

47.     It was a further part of the conspiracy that, on or about September 14, 2003, Gustafson met with Mazutis and Reynolds and otherwise agreed to forge the Plaintiff's signature onto certain documents to enable Gustafson to gain full ownership of the WGD, and thereby facilitate the conspirators' goal of putting the Village in possession of the property.

48.     It was a further part of the conspiracy that, on September 15, 2003, Gustafson and his fellow conspirators forged the Plaintiff's signature to a "settlement agreement" which purported to

13

transfer the Plaintiff's 50% ownership share of the WGD to Gustafson, in return for no monetary consideration whatsoever.

49.     It was a further part of the conspiracy that, on September 15, 2003, after gaining full ownership of the WGD through forgery and fraud, Gustafson signed a scribbled agreement which purported to transfer to Mazutis the right to buy the WGD for $1.25 million.

50.     It was a further part of the conspiracy that, on October 30, 2003, Mazutis proceeded to "assign" her purported "right" to buy the WGD to the Village, for which Mazutis received net proceeds of $242,367, payable in two installments.

51.     It was a further part of the conspiracy that Mazutis subsequently turned over the $242,367 to her partner Reynolds, who had "brokered" the transaction on behalf of the conspirators.

52.     It was a further part of the conspiracy that on November 26, 2003, the Village purchased the WGD from Gustafson for $1.2 million and another $207,000 in taxes, closing costs, utilities and legal fees, thus realizing this goal of the conspiracy and the pattern of racketeering acts done in its furtherance.

53.     Subsequent Phase of the Conspiracy.  An additional goal of the Racketeering Conspiracy was to entice the Chicago Fire professional soccer team to make its home in the Village of Bridgeview, with the World Golf Dome to serve as a winter facility for the team. The Fire's search for a new stadium site required that a nearby facility be available for winter practice; the WGD fit such requirement to a tee. In furtherance of this goal:

> (A)     Landek met with representatives of the Chicago Fire during 2002, who informed him of the team's search for a new stadium site and the necessity for a nearby facility for winter practice, with Landek assuring them that the

14

Village would soon be in possession of a practice facility [i.e., the WGD] for the team;

(B) In September of 2002, Landek submitted a stadium proposal to the Chicago Fire after discussions with the team's general manager, with Landek intending as of such date to wrest ownership of the WGD from the Plaintiff as soon as possible, in order to utilize the WGD as the practice facility which the Fire required;

(C) In January of 2003, Landek hired Reynolds as a "consultant" to perform various services for Landek and the Mayor's Office, which were chiefly limited to chauffeuring representatives of the Chicago Fire around the local area and helping out with Landek's schemes to force the Plaintiff to give up the WGD;

(D) In January of 2004, after the Village had acquired the WGD through the pattern of racketeering acts set forth above, Chicago Fire officials toured the facility before declaring the Village of Bridgeview the winner of the derby to host the team;

(E) Upon successfully enticing the Chicago Fire to make its home in the Village of Bridgeview, Landek announced the construction of a $70 million stadium for the team, to be owned by the Village and amounting to a gigantic impact upon local and interstate commerce as a consequence of the Racketeering Conspiracy.

15

54.     It is *not* alleged that the Chicago Fire and/or its representatives had any involvement whatsoever in the Racketeering Conspiracy; rather, that enticing the soccer team to choose the Village of Bridgeview for its home stadium was a purpose of the Racketeering Conspirators, including Village Mayor Landek, who intended to and did operate the Enterprise toward this goal and were ultimately successful in so doing.

F.     Laws, Duties, and Obligations Applicable to the Defendants:

55.     In performing his acts in furtherance of the Racketeering Conspiracy, as set forth above and herein, defendant Landek was bound by the following laws, duties and obligations:

(a)     As Mayor of the Village of Bridgeview, Landek was required to take an oath of office to faithfully discharge the duties of his office to the best of his abilities.

(b)     In his capacity as Mayor, Landek owed a duty of honest services to the people of the Village of Bridgeview in performing his official duties.

(c)     Pursuant to the criminal laws of Illinois (720 ILCS 5/33-1(d)), in his capacity as Mayor, Landek was prohibited from receiving, retaining, or agreeing to accept any property or personal advantage which he was not authorized by law to accept, knowing that such property or personal advantage was promised or tendered to cause him to influence the performance of any act related to the employment or function of his office.

(d)     Pursuant to the criminal laws of Illinois (720 ILCS 5/33-3), in his capacity as Mayor, Landek was prohibited from (i) knowingly performing an act which he knows he is forbidden by law to perform; (ii) performing an act in excess

16

of his lawful authority, with intent to obtain a personal advantage for himself or others; and (iii) soliciting or knowingly accepting, for the performance of any act, a fee or reward which he knew was not authorized by law.

(e)     Pursuant to the criminal laws of Illinois (720 ILCS 5/32-3), Landek was prohibited from committing subornation of perjury, by inducing another person to make a statement under oath or affirmation which Landek knows to be false.

(f)     Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/8-2.1), Landek was prohibited from conspiring against a person's civil rights to own property in the Village of Bridgeview by agreeing with other individuals to threaten physical harm against that person, and otherwise unlawfully intimidate that person and/or his agents and employees.

(g)     Pursuant to the criminal laws of the United States, Landek was prohibited from engaging in, or conspiring to engage in, acts tantamount to obstruction of justice (18 U.S.C. § 1503 and 1512), extortion (18 U.S.C. § 1951), mail fraud (18 U.S.C. § 1341), and 18 U.S.C. § 1343 (wire fraud).

56.     In performing their acts in furtherance of the Racketeering Conspiracy, as set forth above and herein, defendants DeVries, Reynolds, Mazutis, Pascente, Cainkar, Curry, Kaput, Sloan and Gustafson were bound by the following law, duties and obligations:

(a)     Pursuant to the criminal laws of Illinois (720 ILCS 5/32-3), DeVries was prohibited from committing subornation of perjury, by inducing another person to make a statement under oath which De Vries knows to be false.

17

(b)    Pursuant to the criminal laws of Illinois (720 ILCS 5/33-1), DeVries was prohibited from tendering bribes to a public official with the intent obtain improper influence or advantages on his behalf.

(c)    Pursuant to the criminal laws of Illinois (720 ILCS 5/8-2.1), Reynolds was prohibited from conspiring against a person's civil rights to own property in the Village by agreeing with other individuals to threaten physical harm against that person and/or his agents and employees.

(d)    Pursuant to the criminal laws of Illinois (720 ILCS 5/8-2.1), Mazutis was prohibited from conspiring against a person's civil rights to own property in the Village by agreeing with other individuals to threaten physical harm against that person and/or his agents and employees.

(e)    Pursuant to the criminal laws of Illinois (720 ILCS 5/8-2.1), Pascente was prohibited from conspiring against a person's civil rights to own property in the Village by agreeing with other individuals to threaten physical harm against that person and/or his agents and employees.

(f)    Pursuant to the criminal laws of Illinois (720 ILCS 5/33-3), in his capacity as attorney for the Village, Cainkar was prohibited from (i) knowingly performing an act which he knows he is forbidden by law to perform; (ii) performing an act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; and (iii) engaging in a conspiracy to commit the foregoing.

18

(g)    Pursuant to the criminal laws of Illinois (720 ILCS 5/33-3), in his capacity as a public official and employee of the Village, Curry was prohibited from (i) knowingly performing an act which he knows he is forbidden by law to perform; (ii) performing an act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; (iii) engaging in a conspiracy to commit the same.

(h)    Pursuant to the criminal laws of Illinois (720 ILCS 5/33-3), in his capacity as a public official and employee of the Village, Kaput was prohibited from (i) knowingly performing an act which he knows he is forbidden by law to perform; (ii) performing an act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; (iii) engaging in a conspiracy to commit the same.

(i)    Pursuant to the criminal laws of Illinois (720 ILCS 5/33-3), as a police officer employed by the Village of Bridgeview, Sloan was prohibited from (i) knowingly performing an act which he knows he is forbidden by law to perform; (ii) performing an act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; (iii) engaging in a conspiracy to commit the foregoing.

(j)    In his capacity as a police officer employed by the Village of Bridgeview, Sloan owed a duty of honest services to the people of the Village in the performance of his duties.

19

(k)     Pursuant to the criminal laws of Illinois (720 ILCS 5/17-3), Gustafson was prohibited from committing forgery (i) by making or altering any document apparently capable of defrauding another in such manner that it purports to have been made by another, or by authority of one who did not give such authority; or (ii) by issuing or delivering such document knowing it to have been thus made or altered.

(l)     Pursuant to the common law of Illinois, as erstwhile general partner and 50% owner of the World Golf Dome, Gustafson owed the Plaintiff a fiduciary duty to conduct himself with honesty, candor, rectitude and fairness in all affairs relative to the partnership and/or the WGD, and to refrain from committing acts of forgery, fraud and racketeering to the Plaintiff's detriment.

(m)    Pursuant to the criminal laws of the United States, the defendants DeVries, Reynolds, Mazutis, Pascente, Cainkar, Curry, Kaput, Sloan and Gustafson were prohibited from engaging in, or conspiring to engage in, acts tantamount to obstruction of justice (18 U.S.C. § 1503 and § 1512), extortion (18 U.S.C. § 1951), mail fraud (18 U.S.C. § 1341), and wire fraud (18 U.S.C. § 1343).

## CAUSES OF ACTION

### COUNT I: CIVIL RICO, 18 U.S.C. § 1962(c)

1-56.   The Plaintiff adopts, restates, and incorporates the foregoing paragraphs 1-56 as though fully set forth herein. This Count is brought against the defendants Landek, DeVries, Reynolds, Mazutis, Pascente, Cainkar, Curry, Kaput, Sloan and Gustafson.

20

57.    The defendants, and each of them, being employed by or associated with a tripartite Enterprise within the meaning of the Civil RICO Act, namely (i) the Village of Bridgeview; (ii) the Office of the Mayor of the Village of Bridgeview; and (iii) an Association in Fact of the defendants Landek, DeVries, Reynolds, Mazutis, Pascente, Cainkar, Curry, Kaput, Sloan and Gustafson, engaged in activities which affect interstate commerce, and conducted or participated directly and indirectly in the conduct of the Enterprise's affairs through a pattern of racketeering activity, as set forth above and herein, whereby each defendant furthered the activities of the Enterprise and/or played a role in its operation and management. Indicative of the Enterprise's impact on interstate commerce is the Village's construction of a $70 million, 20,000-seat stadium for the Chicago Fire, set to open in 2006: this massive project being a consequence of the defendants' having enticed the Fire to choose the Village for its stadium site, with the sticking point (a winter practice facility) provided via the Village's divestiture of the World Golf Dome from the Plaintiff's ownership and control. It has been estimated that this project will general $18.5 million annually for the Village, equating a tremendous impact upon interstate commerce as a proximate result of the Racketeering Conspiracy and the acts committed in its furtherance.

58.    The Civil RICO Enterprise(s) include the Village of Bridgeview and the Mayor's Office. The Village and the Mayor's Office are not defendants in this action.

59.    For a period of over five years, the defendants have operated an Enterprise within the meaning of 18 U.S.C § 1961(4), for wrongful and illegal purposes which include defrauding, cheating, and otherwise forcing the Plaintiff into signing away his rights to a domed sports facility that it had been the Plaintiff's quest and dream to operate in the community. Having invested substantial savings in the project—and having utilized the World Golf Dome for such subsidiary

21

projects as a Halloween-related "haunted house", which was designed by the Plaintiff's son and was increasing in popularity with each year—the Plaintiff was hag-ridden, cheated, hounded, bogus-litigated, physically threatened, enjoined, ticketed, and finally defrauded out of his ownership and control of the WGD. The predicate acts in furtherance of the Racketeering Conspiracy are numerous and varied, involve several municipal departments as well as private citizens, and include the issuance of disingenuous and unfounded tickets, citations, fines and injunctions; the orchestration of a campaign of bogus lawsuits; the surreptitious dumping of garbage and other hard-to-remove debris; the subjection of the Plaintiff and his employees to physical intimidation, the brandishing of weapons, and other threats to their safety; and the forging of the Plaintiff's signature on a "settlement agreement" which professed to transfer the Plaintiff's interest in the WGD to co-conspirator Gustafson. Moreover, the defendants also employed the Enterprise to garner improper and illegal financial gains for themselves, including thousands of dollars in unreported "political donations" turned over to Landek by DeVries from the proceeds of events staged at the WGD; and the $242,367 which the Village paid to Mazutis for her role in the scheme. The number and variety of these acts, the length of time over which they were committed, and the separate schemes of the conspiracy suffice to establish a pattern and continuity of racketeering activity by the conspirators.

60.     Moreover, in regard to the continuity of the defendants' racketeering activity, it is relevant for the purposes of civil RICO that, as of the filing of this Complaint, Landek is still in office as Mayor, Curry still serves as a Code Enforcement Inspector, Kaput still serves as Director of Building and Inspection Services, Cainkar is still attorney for the Village, Sloan still works for the Village police department, and the remaining defendants are still at large in the community. In light of the ongoing commercial boom afforded by the enticement of the Chicago Fire to Bridgeview,

22

there remains a manifest threat that the defendants will continue to operate the Enterprise, by and through a pattern of racketeering activity, to garner illegal and wrongful gains for themselves and their confederates out of the $18.5 million in estimated annual revenue which the new home stadium (set to open in 2006) will bring to the area. Having sought to win the competition amongst local communities to host the Chicago Fire by utilizing racketeering acts to gain possession of a practice facility for the team—it must be presumed and inferred that the defendants are ready, willing and able to continue to operate the Enterprise to commit wrongful and illegal acts in the future.

61. The specific acts of the defendants. While the full details of the Racketeering Conspiracy are within the sole knowledge and control of the defendants, it is possible to determine that each and every defendant is employed by or associated with the Enterprise, and played a role in the Enterprise's operation, management or control and/or exercised a degree of direction over its affairs. The defendants each undertook predicate actions, as set forth below, with the intent to defraud, cheat, or otherwise force the Plaintiff to sell, assign, transfer, or otherwise surrender ownership and control of the World Golf Dome, or to otherwise facilitate and implement the remaining goals of the conspiracy as set forth herein.

62. Defendant Steven Landek, Mayor of the Village of Bridgeview, is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control of the World Golf Dome, and to accomplish other improper and illegal objectives, conducts and participates in the activities of the Enterprise by actions, directives and decisions in his official capacity as Mayor which are intended for his own profit and advantage, and the profit and advantage of the other defendants; he has directed and engaged in activities which he knew would result in the use of the United States mails, the sending of

23

correspondence by facsimile, the sending/receiving of official memoranda and the filing, docketing, processing or presentation of official documents in State courthouses, including the following:

    A.    In or about May of 1999, Landek instructed Curry, either personally or through an agent of the Enterprise, to begin a campaign of harassment of the Plaintiff in his (Curry's) official capacity as a Building Inspector, amounting to official misconduct by Landek;

    B.    In or about August of 1999, Landek met and conferred with DeVries and otherwise arranged that DeVries would use the WGD to skim proceeds, disguised as "political donations," for Landek's personal use and benefit, amounting to official misconduct by Landek;

    C.    In or about November of 1999, Landek instructed Sloan, either personally or through an agent of the Enterprise, to begin a campaign of harassment of the Plaintiff in his (Sloan's) official capacity as a police officer, amounting to official misconduct by Landek;

    D.    On November 17, 1999 and following, Landek was personally aware of, and otherwise authorized and directed, the issuance of Village complaints, citations and tickets against the WGD for no good cause and/or for the ulterior motive of hindering and obstructing the Plaintiff in his attempts to run his business, including complaints CC-689-201 (open for business without a license) and CC-689-202 (building occupied without a permit), and citations PO45612 (weeds over 30"), PO47766 (no valid food permit), PO45556 (inadequate ventilation of kerosene heaters), PO45547 (no storage of combustible material allowed), P045548 (no fuel fired heaters used without permission), PO45550 (no adequate ventilation while using kerosene), PO45549 (heating devices shall comply with standards),

24

PO47529 (piles of broken concrete and tree stumps dumped on property), PO47646 (piles of broken concrete and tree stumps dumped on property), PO46895 (no business license), PO46896 (no certificate of occupancy), PO46897 (unlawful to deface sticker)—Landek authorizing and otherwise approving that these citations, complaints and tickets be issued against the WGD with the intent of advancing the purposes of the Racketeering Conspiracy, amounting to official misconduct and obstruction of justice;

E.      Use of the United States Mail, on November 17, 1999, Landek through his agent and co-conspirator Curry, caused, directed and authorized that a letter be transmitted to Plaintiff stating that the WGD was closed until a "new temporary certificate of occupancy" could be issued, this letter being disingenuous and sent in furtherance of the scheme to force the Plaintiff to give up his ownership of the WGD, amounting to mail fraud;

F.      Use of the United States Mail, on June 21, 2000, Landek composed and sent a letter to the Plaintiff stating that he felt it would be "extremely difficult" for Plaintiff to resolve the "outstanding issues" by the end of the month, in which case the WGD could not stay open past June 31, 2000; this letter being disingenuous and sent in furtherance of the racketeering scheme, amounting to mail fraud and official misconduct;

G.      On or about July 19, 2000, Landek through his agent and co-conspirator DeVries authorized and directed that the contract for the impending "Tattoo the Earth" rock concert at the WGD include a provision requiring that five percent of the proceeds be utilized for a purported "political donation." Landek intended to use such proceeds for his personal profit and advantage, amounting to official misconduct and extortion;

H.    On or about July 26, 2000, Landek through his agent and co-conspirator DeVries skimmed and pocketed for Landek's personal use and benefit certain unreported cash proceeds, in the amount of $2,332.12, from the receipts of the "Tattoo the Earth" concert staged at the WGD, amounting to official misconduct, acceptance of a bribe and income tax fraud;

I.    Use of the United States Mail, on August 9, 2000, Landek through his agent and co-conspirator Cainkar, caused, directed and authorized that a letter be sent to the Plaintiff informing Plaintiff that a dance party planned at the WGD "is not allowed under the ordinances of the Village," this August 9, 2000 letter being disingenuous and sent in furtherance of the racketeering scheme, amounting to mail fraud;

J.    Use of the United States Mail, on or about November 1, 2000, Landek through his agent and co-conspirator Cainkar, caused, directed and authorized that a real estate appraisal be performed of the WGD, this appraisal necessitating correspondence on behalf of Landek to be composed and sent via the United States mails or by facsimile, the appraisal being obtained and correspondence sent in furtherance of the racketeering scheme, amounting to mail fraud, wire fraud and official misconduct;

K.    Sending of correspondence by facsimile, on or about June 18, 2002, Landek composed and sent to the Plaintiff by facsimile a letter requesting that Plaintiff "please read read the [November 1, 2000] appraisal and call me"—this June 18, 2002 cover letter accompanying a faxed transmission of said appraisal, and being sent [i.e., the June 18, 2002 letter] in furtherance of the racketeering scheme, amounting to mail and/or wire fraud and official misconduct;

26

L.    In or about January of 2003, Landek instructed Kaput, either personally or through an agent of the Enterprise, to begin a campaign of harassment of the Plaintiff in his (Kaput's) official capacity as Director of Building and Inspection Services for the Village, amounting to official misconduct by Landek;

M.    In or about August of 2003, Landek conferred with Reynolds, Pascente, Gustafson and Mazutis, and otherwise agreed and arranged that the Plaintiff would be subjected to mafia-style intimidation, threats of physical violence, the brandishing of weapons, and other illegal and outrageous tactics to force him to sign over ownership of the WGD to the members of the conspiracy, amounting to official misconduct, violation of Plaintiff's civil rights, and extortion by Landek;

N.    On September 12, 2003, Landek encouraged and facilitated Reynolds' and Pascente's intimidation and extortion of the Plaintiff [and of the Plaintiff's employee Donna O'Connell] by (i) disingenuously speaking to Ms. O'Connell via Reynolds' cell phone, assuring her that the situation did not warrant her concern; and (ii) by thereafter instructing the Village police officers to desist from further involvement in the situation, amounting to official misconduct, the abetting of extortion and obstruction of justice by Landek;

O.    On or about September 15, 2003, Landek encouraged Gustafson to forge the Plaintiff's signature onto certain documents to enable Gustafson to gain full ownership of the WGD, amounting to official misconduct and the abetting of forgery;

P.    Use of the United States Mail, on November 6, 2003, Landek through his agent and co-conspirator Cainkar caused, directed and authorized that a letter be sent to Plaintiff's former attorney Kenneth F. Thiesen, threatening that in the event a "voluntary

sale" of the WGD was not finalized, "then the Village can simply file an eminent domain action and let a court sort out the interests of all the parties." This letter also stated that the "physical pressure" levied on the Plaintiff, to force him to give up his rights to the WGD, was [somehow] "without Village authorization and knowledge." This letter was sent in furtherance of the racketeering scheme [and included a threat to exploit the doctrine of eminent domain toward such end], amounting to official misconduct, mail fraud and extortion;

Q.      In addition to the above acts of mail fraud and other crimes by Landek, the scheme to cheat and defraud the Plaintiff out of his ownership of the WGD [and to vest the Village with ownership of the facility and thereby entice the Chicago Fire to build its home stadium in the Village] has involved other uses of the United States Mail and other wrongful acts by Landek, which are within the exclusive knowledge of Landek and other defendants but will be disclosed in the course of discovery, including [in regard to mail fraud] correspondence composed and/or authorized by Landek regarding (i) the availability of the WGD as a practice facility for the Chicago Fire; (ii) the acquisition of, and renovation of, the WGD for such purpose; (iii) the enticement of the Fire to choose the Village for its home stadium site; (iv) the planning, financing, and construction of the Fire's home stadium; and (v) the facilitation of the goals of the conspiracy in its latest phase, in regard to the manifold opportunities for the advancement of the defendants' illicit gains by and through the $18.5 million in estimated annual income which the new stadium for the Fire (set to open in 2006) will bring to the Village. On information and belief, all such additional [and as yet not specifically known] items of correspondence were sent at the direction of Landek, either

personally or through an agent of the Enterprise, and are tantamount to a continuing pattern of racketeering activity by Landek. Moreover, on information and belief, Landek has continued to exploit the Enterprise to garner improper and illegal profits for himself and his co-conspirators, through the skimming of proceeds from various events staged at the former World Golf Dome (now known as the Bridgeview Sports Dome), the obtaining of various bribes, kickbacks and pay-offs, and other racketeering-related schemes.

63.    Defendant Kenneth Devries is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of racketeering activity, including:

A.    On or about July 25, 2000, DeVries arranged for certain "political donations" to be skimmed from the receipts of the "Tattoo the Earth" concert at the WGD—intending to turn over such proceeds to Landek for the latter's personal profit in return for various emoluments and political favors. On or about July 26, 2000, following the concert, DeVries turned over skimmed "donations" of $2,332.12 to Landek, amounting to bribery and the abetting of official misconduct;

B.    Use of the United States Mail, on September 30, 2000, DeVries composed and sent a letter to the Plaintiff listing 25 purported complaints by DeVries as the Plaintiff's tenant, this letter being disingenuous and sent in furtherance of the scheme to force the Plaintiff to give up his ownership of the WGD, amounting to mail fraud;

29

C.     Use of the United States Mail, on October 14, 2000, DeVries composed and sent a letter to Plaintiff listing the former's purported grievances about parking and refreshments at a "Haunted Spaceship" event at the WGD, this letter courtesy-copied to Landek, Curry, Sloan and other agents of the Enterprise, this letter being disingenuous and sent in furtherance of the racketeering scheme, amounting to mail fraud;

D.     Use of the United States Mail, on October 16, 2000, DeVries composed and sent to Plaintiff a letter setting forth more purported complaints about the "Haunted Spaceship" event, this letter courtesy-copied to Landek, Curry, Sloan and other agents of the Enterprise, this letter being disingenuous and sent in furtherance of the racketeering scheme, amounting to mail fraud;

E.     Use of the United States Mail, on February 1, 2001, DeVries composed and sent to Plaintiff a letter setting forth various purported grievances about the WGD, this letter courtesy-copied to various agents of the Enterprise, the letter being disingenuous and sent in furtherance of the racketeering scheme, amounting to mail fraud;

F.     On or about February 8, 2001, DeVries set up an illegal and hazardous gas connection at the Scoreboard restaurant adjacent to the WGD, doing so with the intent of annoying and antagonizing the Plaintiff [whose employees were the ones at risk], in furtherance of the racketeering scheme;

G.     Use of the United States Mail, on March 31, 2001, DeVries composed and sent to Plaintiff a letter regarding purported "defects" in the construction of the WGD [and threatening a lawsuit if such 'defects' were not corrected], this letter being disingenuous and sent in furtherance of the racketeering scheme, amounting to mail fraud;

30

H.    On or about April 2, 2001, DeVries filed a lawsuit for $117,000 in damages against the Plaintiff, this lawsuit based upon false and fraudulent allegations and brought in furtherance of the racketeering scheme, this lawsuit also occasioning various items of correspondence to be sent by or on behalf of DeVries through the United States Mail and/or by facsimile, amounting to perjury, mail fraud and/or wire fraud;

I.    Use of the United States Mail, on April 19, 2003, DeVries composed and sent to Plaintiff a letter which denied Plaintiff access to the restaurant in order to inspect certain building code 'violations' therein [for which Plaintiff had been previously cited by fellow conspirators Curry and Kaput], this letter being disingenuous and sent in furtherance of the racketeering scheme, amounting to mail fraud;

J.    Throughout the 2000-2003 period, DeVries willfully and intentionally refused to pay the taxes and utilities incurred by the Scoreboard restaurant, notwithstanding that the lease obligated him [and not the Plaintiff] to be responsible for such obligations. DeVries so acted in furtherance of racketeering scheme, knowing that his refusal to pay such obligations would offer a pretext and opportunity for the conspirators to harrow the Plaintiff for payment of the same—amounting to fraudulent conduct by DeVries;

K.    In addition to the above acts of mail fraud and other racketeering crimes by DeVries, this defendant has continued to engage in a pattern of activity in furtherance of the conspiracy, including (on information and belief) (i) the aiding, encouragement, and facilitation of numerous bogus lawsuits brought by various agents of the Enterprise against the Plaintiff during the 2001-2003 period; and (ii) the turn-over of additional bribes and pay-offs to Landek and other agents of the Enterprise, skimmed from the receipts of events staged

31

at the former World Golf Dome (now known as the Bridgeview Sports Dome), with which DeVries has continued to be closely involved via his operation of the Scoreboard restaurant adjacent thereto. DeVries, moreover, has been a prominent contributor to Landek's campaign committees over the course of the conspiracy, and, on information and belief, has exploited his status as a political backer of Landek to facilitate the goals of the conspiracy in its current and latest phase, in regard to the manifold opportunities for the advancement of the defendants' personal gains by and through the $18.5 million in estimated annual income which the new stadium for the Chicago Fire will bring to the local community.

64. Defendant Steven Reynolds is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of racketeering activity, including:

A. In or about November of 2002, Reynolds, through the intercession and authorization of Village Mayor Landek, was hired by the Village for $300 per week as a purported janitorial worker, this employment arrangement being in reality a "cover" for Reynolds' actual, intended employment, on behalf of the Enterprise, in furtherance of the scheme to force the Plaintiff to give up his ownership of the WGD. After being "hired" by the Village, on information and belief, Reynolds performed little or no janitorial labors but instead spent his working hours in informal and unofficial meetings with Landek, Cainkar, Pascente, DeVries, Mazutis and other agents of the Enterprise in regard to enabling the goals of the conspiracy, and was otherwise employed in implementing ways and means whereby

the racketeering scheme would be facilitated;

B.     Abetting of official misconduct, from 1999 to 2003, Reynolds in the course of his employment as a warehouse supervisor for the Cook County Forest Preserve District, personally authorized the purchase of approximately $14,000 in janitorial supplies from Eco-Chem, a company owned by fellow conspirator Landek. On information and belief, these proceeds were expended to facilitate the goals of the conspiracy by and through the Enterprise, Reynolds having intended to assist Landek as a co-conspirator when he authorized the purchase of said supplies from Landek's company;

C.     In January of 2003, Reynolds was hired by Landek as a "consultant" for $3,200 per month, with the responsibility of performing various 'odd jobs' for Landek. On information and belief, after taking this purported position, Reynolds proceeded to render additional services in furtherance of the conspiracy, by (i) conferring with Landek, Cainkar, Pascente, Mazutis, Gustafson and other agents of the Enterprise in regard to wresting the ownership of the WGD from the Plaintiff as soon as possible and by any means necessary; and (ii) helping to persuade the Chicago Fire to choose the Village for its home stadium site, by working as a chauffeur, liaison, and general representative of the conspiracy in unofficial and informal conferences with representatives of the team;

D.     In or about August of 2003, Reynolds met with Pascente, Gustafson and Mazutis, Landek and other agents of the Enterprise and otherwise agreed and arranged that the Plaintiff would be subjected to mafia-style intimidation in order to force him to sign over his interest in the WGD, amounting to a participation in a conspiracy to violate the Plaintiff's civil rights and the abetting of official misconduct by Reynolds;

33

E.    On or about September 9, 2003, Reynolds met with Gustafson and other agents of the Enterprise, and otherwise proposed and arranged that Gustafson would turn over to him [Reynolds] the corporate books and stock certificates of the WGD, in order to facilitate the defendants' scheme to divest the Plaintiff of his interest in the WGD;

F.    Use of the United States Mail, on or about September 10, 2003, Reynolds through his agent and co-conspirator Gustafson caused a letter to be mailed to Attorney Thomas Morrison, wherein Morrison was directed to turn over the books and stock certificates of the WGD to Reynolds. Reynolds intended that this letter would help facilitate the racketeering scheme, amounting to mail fraud by Reynolds;

G.    On September 12, 2003, Reynolds, Pascente and a hulking accomplice visited the WGD, armed with revolvers and intending to utilize threats of physical violence to coerce the Plaintiff to sign over his ownership of the WGD, amounting to extortion and participation in a conspiracy to violate the Plaintiff's civil rights by Reynolds;

H.    On September 12, 2003, on arriving at the WGD and learning that Plaintiff was temporarily absent, Reynolds and his co-conspirators physically abused a female employee, forced her into their automobile against her will, and threatened to commit acts of violence upon her and upon the Plaintiff, amounting to extortion, assault and battery, intentional infliction of emotional distress, deprivation of personal liberty, and participation in a conspiracy to violate the Plaintiff's civil rights;

I.    On September 12, 2003, Reynolds, Pascente and their hulking accomplice, armed with revolvers, proceeded to coerce and intimidate the Plaintiff into signing away his interest in the WGD to Pascente for the purported amount of $175,000 [said purported sum

34

never being paid to Plaintiff], amounting to extortion, fraud and participation in a conspiracy to violate the Plaintiff's civil rights;

J.        On or about September 14, 2003, Reynolds met with Gustafson and Mazutis and otherwise helped to propose and arrange that Gustafson would (i) forge the Plaintiff's name to a purported "agreement" that transferred the Plaintiff's 50% interest in the WGD to Gustafson; and (ii) that Gustafson would thereupon prepare a second agreement which transferred the ownership of the WGD to Mazutis [Reynolds' partner and fiancee]— thus facilitating the goals of the conspiracy while ensuring that he, Reynolds, remained "behind the scenes" and was not named on any of the documents in question;

K.        On or abut October 10, 2003, Reynolds met with Landek, Mazutis, Cainkar, and other agents of the Enterprise, and otherwise helped propose and arrange that the Village would pay $1.65 million to Mazutis for her "ownership" of the WGD—thus to reap substantial profits for Mazutis and himself from the defendants' scheme;

L.        On or about October 30, 2003, Reynolds met with Landek, Mazutis, Cainkar, Gustafson and other agents of the Enterprise, and otherwise participated in the formulation of a 'fall-back' plan, whereby the Village would pay Gustafson $1.2 million for the WGD and pay $450,000 to Mazutis;

M.        On October 31, 2003, as a consequence of the racketeering activities of Reynolds and his co-conspirators, the Village entered into an agreement to pay Gustafson $1.2 million for the WGD, with net proceeds of $242,367 payable to Mazutis [after payment of closing costs, utility bills and legal fees] in two installments;

N.    In February of 2004, the Village made its second and final installment payment of $62,337 to Mazutis, whereupon she turned over such proceeds [i.e., totaling $242,367] to Reynolds for their shared profit and advantage—thus facilitating Reynolds' goal of reaping personal gains from the Racketeering Conspiracy in as circumspect a manner as possible.

O.    In addition to Reynolds' foregoing acts of mail fraud, extortion and other crimes, the scheme to cheat and defraud the Plaintiff out of his ownership of the WGD [and to vest the Village with ownership of the facility and thereby entice the Chicago Fire to make its home in the Village] has involved other racketeering violations by Reynolds, which are within the exclusive knowledge of Reynolds and other parties but will be disclosed in discovery. On information and belief, Reynolds has continued to exercise a material degree of direction, management and control in furtherance of the conspiracy in its latest phase, in regard to the advancement of the defendants' illicit gains by and through the $18.5 million in estimated annual income which the new home stadium for the Chicago Fire will bring to the community. On information and belief, Reynolds' role in regard to this latest [and ongoing] phase of the conspiracy has been to exploit his purported political "connections" in the Village of Bridgeview to the advantage of himself and his fellow conspirators. Moreover, on information and belief, Reynolds has expended the profits he has gleaned from the Racketeering Conspiracy on the purchase of numerous pieces of property scarcely affordable by a person earning his purported salary, including an upscale residence in Lemont, Illinois; two properties in Lockport, Illinois; a vacation home in Scottsdale, Arizona; a Cadillac Escalade and Mercedes Benz sedan; and other acquisitions.

36

65.    Defendant Adriana Mazutis is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of racketeering activity, including:

A.    In or about November of 2002, Mazutis met with Reynolds and Landek, and otherwise conspired with them and other agents of the Enterprise in regard to the bogus arrangement of Reynolds being hired by the Village for $300 per week as a supposed janitorial employee [this employment arrangement being a "cover" for Reynolds' actual, intended employment, on behalf of the Enterprise, in furtherance of the defendants' scheme to force the Plaintiff to give up his ownership of the WGD]. Following Reynolds' "hiring" by the Village, on information and belief, Mazutis attended numerous informal and unofficial meetings with Reynolds, Landek and other defendants, and otherwise participated in implementing the various goals of the Racketeering Conspiracy;

B.    In or about August of 2003, Mazutis met with Reynolds, Pascente, Gustafson, Landek and other agents of the Enterprise and agreed that the Plaintiff would be subjected to mafia-style intimidation in order to force him to sign over his interest in the WGD, amounting to a participation in a conspiracy to violate the Plaintiff's civil rights and the abetting of official misconduct by Mazutis;

C.    Use of the United States Mail, on or about September 10, 2003, Mazutis met with Reynolds and Gustafson and otherwise helped formulate the plan of sending a letter to Thomas Morrison [Gustafson's attorney], directing that the corporate books and stock

37

certificates of the WGD be turned over to her fiancé Reynolds. Mazutis intended that this letter would help facilitate the racketeering scheme, amounting to mail fraud;

E.  On or about September 14, 2003, Mazutis met with Gustafson and Reynolds and otherwise helped to formulate a plan that Gustafson would (i) forge the Plaintiff's name to an "agreement" that transferred the Plaintiff's interest in the WGD to Gustafson; and (ii) prepare a second agreement that transferred the ownership of the WGD to Mazutis;

F.  On September 15, 2003 [after Gustafson forged the Plaintiff's name to an "agreement" which gave Gustafson 100% ownership of the WGD], Mazutis signed a handwritten agreement [prepared by Gustafson] which purported to transfer the ownership of the WGD to Mazutis;

G.  On or abut October 10, 2003, Mazutis met with Landek, Reynolds, Cainkar and other agents of the Enterprise, and otherwise helped formulate a plan that the Village would pay $1.65 million to Mazutis for her "ownership" of the WGD— trying to ensure that Mazutis [and her fiancé Reynolds] would reap substantial profits from the racketeering scheme;

H.  On or about October 30, 2003, Mazutis met with Landek, Reynolds, Cainkar, Gustafson and other agents of the Enterprise, and otherwise participated in the formulation of a 'fall-back' plan, whereby the Village would pay Gustafson $1.2 million for the WGD and pay $450,000 to Mazutis;

I.  On October 31, 2003, as a consequence of the racketeering-related acts of Mazutis and her co-conspirators, the Village entered into an agreement to pay Gustafson $1.2 million for the WGD, with net proceeds of $242,367 payable to Mazutis [after payment of

38

closing costs, utility bills and legal fees] in two installments;

J.      In February of 2004, the Village made its second and final installment payment of $62,337 to Mazutis, whereupon she shared such proceeds with her fiancé, business partner and co-conspirator Reynolds.

K.      In addition to Mazutis' foregoing racketeering-related activities, there have been numerous other acts by this defendant in furtherance of the conspiracy, which are within the exclusive knowledge of Mazutis and other parties but will be revealed in the course of discovery. Mazutis' association with the Enterprise has entailed a degree of direction on her part of the affairs of the conspiracy, and a material role in the implementation of the defendants' schemes: she has participated in the creation and facilitation of strategies to defraud and cheat the Plaintiff of his ownership of the WGD, and to accomplish other goals of the conspirators. Moreover, on information and belief, Mazutis has continued to engage in racketeering acts in furtherance of the conspiracy, in regard to its ongoing goal of garnering personal profits and other illicit gains for its members from the $18.5 million in estimated annual income which the new home stadium for the Chicago Fire will bring to the community. On information and belief, Mazutis has expended the profits she has received from the Racketeering Conspiracy on the purchase of expensive items of property, owned by herself and/or her fiancé Reynolds, including a residence in Lemont, Illinois; two properties in Lockport, Illinois; a vacation home in Scottsdale, Arizona; a Cadillac Escalade and a Mercedes Benz sedan; and other acquisitions.

66.      Defendant Fred Pascente is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control

of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of racketeering activity, including:

A.  In or about August of 2003, Pascente met with Gustafson and Mazutis, Landek and other agents of the Enterprise, and otherwise agreed and arranged that the Plaintiff would be subjected to mafia-style intimidation in order to force him to sign over his interest in the WGD, amounting to a participation in a conspiracy to violate the Plaintiff's civil rights and the abetting of official misconduct by Pascente;

B.  In August-September of 2003, Pascente proceeded to direct, manage and implement the ways and means by which the Plaintiff would be coerced into signing away his rights to the WGD. Pascente, among other things, contacted a hulking and imposing accomplice; arranged for the provision of loaded revolvers for himself, Reynolds and the accomplice; and otherwise handled the implementation of this phase of the conspiracy;

C.  Pascente, a former Chicago police officer who served time in a federal prison for insurance fraud [and who was reportedly blacklisted by the Nevada Gaming Commission in 1999 for having a notorious reputation] exploited his reputation as a person with organized-crime connections in the course of planning and implementing this phase of the conspiracy;

D.  Pursuant to Pascente's racketeering acts in furtherance of the conspiracy, on September 12, 2003, Pascente, Reynolds and their hulking accomplice visited the WGD, armed with revolvers and intending to utilize threats of physical violence to force the Plaintiff to sign over his ownership of the WGD "on the spot" to Pascente;

40

E.      On September 12, 2003, on arriving at the WGD and learning that the Plaintiff was away, Pascente assisted and enabled Reynolds as the latter physically abused a female employee, forced her into an automobile against her will, and threatened to commit acts of violence upon her and upon the Plaintiff, amounting to the abetting of extortion, deprivation of personal liberty, and participation in a conspiracy to violate the Plaintiff's civil rights by Pascente;

F.      On September 12, 2003, Pascente, Reynolds and their hulking accomplice, armed with revolvers, proceeded to coerce and intimidate the Plaintiff into signing away his interest in the WGD to Pascente for the purported amount of $175,000 [said purported sum never being paid to Plaintiff], amounting to extortion, fraud and participation in a conspiracy to violate the Plaintiff's civil rights;

G.      In addition to Pascente's foregoing acts of extortion and other crimes in furtherance of the Racketeering Conspiracy, on information and belief he has continued to be employed on behalf of the Enterprise in regard to the defendants' current goal of maximizing their personal profits and other illicit gains by and through the estimated $18.5 million in annual income which the new home stadium for the Chicago Fire will bring to the area. On information and belief, Pascente has continued to be of service to Landek, Reynolds and the other co-conspirators toward these and related goals through acts of intimidation, violence, extortion, and general "strong-arm" tactics, and has continued to exploit his reputed connection to organized crime in so doing. Pascente's involvement in these recent matters has entailed a degree of direction, management and control over the affairs of Enterprise, in keeping with his preceding acts set forth above.

41

67. Defendant Vincent Cainkar is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of racketeering activity, including:

A. Use of the United States Mail, on August 9, 2000, Cainkar composed and mailed a letter to the Plaintiff informing the latter that a dance party planned at the WGD "is not allowed under the ordinances of the Village," this letter being disingenuous and sent in furtherance of the scheme to force the Plaintiff to give up his ownership of the WGD, amounting to mail fraud;

B. Use of the United States Mail and/or facsimile transmission, on or about November 1, 2000, Cainkar had a commercial real estate appraisal performed of the WGD in order to facilitate an objective of the conspiracy, namely to ascertain the market value of the facility which the defendants were trying to wrest from Plaintiff's ownership. On information and belief, Cainkar directed and managed this phrase of the conspiracy, while reporting to Landek regarding the progress of the same. On information and belief, various items of correspondence were composed and mailed by Cainkar, via the United States mail and/or by facsimile, in regard to the obtaining of this appraisal and the facilitation of the conspirators' goal embodied therein. On or about November 6, 2000, the appraisal of the WGD was completed by the firm of Holger & Company, Inc., and Cainkar reviewed the appraisal and conferred with Landek about the next steps to be taken in furtherance of the scheme, amounting to mail fraud, wire fraud and official misconduct by Cainkar;

42

C. Use of the United States Mail and/or facsimile transmission, on September 10, 2003, Cainkar wrote and sent to Landek a memorandum stating that Gustafson "is going to have to come to an agreement with [the Plaintiff] and ultimately become the 100 percent owner" of the WGD. Cainkar composed and sent this disingenuous memo with the intent of facilitating the conspir`ators' goal that Gustafson acquire 100% ownership of the WGD by any means necessary [including forgery], amounting to mail and/or wire fraud and official misconduct by Cainkar;

D. Use of the United States Mail and/or facsimile transmission, on October 22, 2003, Cainkar composed and sent a letter to Mazutis's attorney, stating that the Village would buy the WGD from Gustafson for $1.2 million and pay Mazutis $450,000 in order to "minimize the complaints that someone is making a profit other than the current owners." Cainkar composed and sent this disingenuous letter with the intent of facilitating the conspirators' goal of implementing a plan for the Village's acquisition of the WGD that would avoid excessive suspicion while reaping profits from the transaction for the defendants, amounting to mail and/or wire fraud and official misconduct by Cainkar;

E. Use of the United States Mail, on November 6, 2003, Cainkar composed and sent a letter to Plaintiff's former attorney Kenneth F. Thiesen, threatening that in the event a "voluntary sale" of the WGD was not finalized, "then the Village can simply file an eminent domain action and let a court sort out the interests of all the parties." This letter also stated that the "physical pressure" levied on the Plaintiff, to force him to give up his rights to the WGD, was [somehow] "without Village authorization and knowledge." This letter was sent in furtherance of the racketeering scheme [and included a threat to exploit the

doctrine of eminent domain toward such end], amounting to mail fraud, official misconduct, and extortion by Cainkar;

      F.     In addition to Cainkar's racketeering activities set forth above, on information and belief, Cainkar has continued to be employed by the Enterprise and to play an important role in the Racketeering Conspiracy in his capacity as the attorney for the Village of Bridgeview. On information and belief, Cainkar has committed further acts of mail fraud in facilitation of the conspiracy, which are within Cainkar's exclusive knowledge (and that of other defendants) but will be revealed through discovery, inclusive of correspondence and/or facsimile transmissions regarding (i) the availability of the WGD as a practice facility for the Chicago Fire; (ii) the acquisition of, and renovation of, the WGD for such purpose; (iii) the enticement of the Fire to choose the Village for its home stadium site; (iv) the planning, financing, and construction of the Fire's home stadium in the Village; and (v) the facilitation of the goals of the conspiracy in its current and latest phase, in regard to the manifold opportunities for the advancement of the defendants' illicit gains by and through the $18.5 million in estimated annual income which the new stadium for the Fire will bring to the Village. Cainkar has exercised a considerable degree of direction, management and control of his activities in furtherance of the defendants' schemes, in keeping with his status as the 'legal' arm of the Racketeering Conspiracy.

      68.     Defendant John Curry is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of

racketeering activity, including:

A.    In or about May of 1999, Curry met with Landek and otherwise agreed and arranged to begin a campaign of harassment of the Plaintiff, in his official capacity as a Village Building Inspector, amounting to official misconduct by Curry;

B.    On or about June 1, 1999, Curry, accompanied by agents of the Enterprise, appeared at the WGD [which was under construction], and stopped construction for the purported reason that the steel beams were "undersized", being a disingenuous pretext for Curry to harass the Plaintiff in keeping with the goals of the conspiracy;

C.    On or about November 5, 1999, Curry appeared at the WGD, accompanied by agents of the Enterprise, and stated to Plaintiff's employees in a hostile manner that the facility was going to be closed due to a purported lack of a business license, being a disingenuous pretext for Curry to harass the Plaintiff in keeping with the goals of the conspiracy;

D.    Use of the United States Mail, on November 17, 1999, Curry composed and sent to Plaintiff a letter stating that the WGD was closed until the Village received a $60,000 letter of credit, this letter being disingenuous and sent in furtherance of the scheme to force the Plaintiff to give up his ownership of the WGD, amounting to mail fraud;

E.    On or about November 18, 1999, Curry dispatched a Village police officer [and agent of the Enterprise] to the WGD, with directives that the WGD be closed down for purported lack of a business license and occupancy permit, causing the Plaintiff to receive two $750 citations and attend a hearing at which both tickets were dismissed [the tickets not even being signed by the officer], the entire affair being part of the racketeering scheme,

amounting to official misconduct by Curry;

    F.      On or about February 8, 2001, Curry refused to take any action to remedy, sanction or otherwise address an illegal and hazardous gas connection which fellow conspirator DeVries had set up in the Scoreboard restaurant adjacent to the WGD. Curry's decision to take no action to mitigate such hazard was in furtherance of the racketeering scheme, amounting to official misconduct by Curry;

    G.      On or about April 27, 2001, Curry appeared at the WGD, accompanied by a Village police officer [and agent of the Enterprise], and commenced to verbally assault Plaintiff's employees for no proper reason, this visit being a pretext to carry out the goal of harassing the Plaintiff at the workplace, amounting to official misconduct by Curry;

    H.      On or about March 10, 2003, Curry appeared at the WGD, accompanied by Kaput, Sloan and other agents of the Enterprise, for a purported inspection of the parking lot of the WGD, this inspection being disingenuous and picayune and part of the racketeering scheme, amounting to official misconduct by Curry;

    I.      On or about March 11, 2003, Curry appeared at the WGD, accompanied by fellow conspirators Kaput and Sloan, for a purported inspection of the brickwork of the WGD, this inspection being disingenuous and picayune and part of the racketeering scheme, amounting to official misconduct by Curry;

    J.      On or about March 27, 2003, Curry appeared at the WGD, accompanied by Kaput, Sloan and other agents of the Enterprise, for a purported inspection of the support columns of the WGD, this inspection being disingenuous and picayune and part of the racketeering scheme, amounting to official misconduct by Curry.

K.     In addition to the foregoing acts of mail fraud and other official misconduct by Curry, on information and belief, this defendant has continued to be employed by the Enterprise and to commit racketeering acts in its furtherance, in his capacity as a Village Code Enforcement Building Inspector, in regard to the ongoing construction and renovation throughout the area occasioned by the completion of the new home stadium for the Chicago Fire and the estimated $18.5 million in annual income which the project will bring to the community. In the commission of his racketeering acts, Curry has exercised a considerable degree of personal direction, autonomy and control and otherwise knowingly and creatively facilitated the goals of the conspiracy. The specific acts committed by Curry in regard to the ongoing phase of the conspiracy are within the exclusive knowledge of Curry and the other defendants but will be revealed in the course of discovery.

69.     Defendant Joseph Kaput is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of racketeering activity, including:

A.     In or about January of 2003, Kaput met with Landek and otherwise agreed and arranged to begin a campaign of harassment of the Plaintiff, in his official capacity as a Village Building Inspector, amounting to official misconduct by Kaput;

B.     On or about March 10, 2003, Kaput appeared at the WGD, accompanied by Curry, Sloan and other agents of the Enterprise, for a purported inspection of the parking lot of the WGD, this inspection being disingenuous and picayune and part of the racketeering

47

scheme, amounting to official misconduct by Kaput;

C.     On or about March 11, 2003, Kaput appeared at the WGD, accompanied by fellow conspirators Curry and Sloan, for a purported inspection of the brickwork of the WGD, this inspection being disingenuous and picayune and part of the racketeering scheme, amounting to official misconduct by Kaput;

D.     On or about March 27, 2003, Kaput appeared at the WGD, accompanied by Curry, Sloan and other agents of the Enterprise, for a purported inspection of the support columns of the WGD, this inspection being disingenuous and picayune and part of the racketeering scheme, amounting to official misconduct by Kaput;

E.     Use of the United States Mail, on or about June 24, 2003, Kaput composed and mailed a letter to the Plaintiff setting forth certain modifications that were supposedly necessary for the WGD, this letter being disingenuous and picayune and sent in furtherance of the racketeering scheme, amounting to mail fraud.

F.     In addition to the foregoing acts of mail fraud and official misconduct by Kaput, on information and belief, this defendant has continued to be employed by the Enterprise and to commit racketeering acts in its furtherance, in his capacity as the Direction of Building and Inspection Services for the Village, in regard to the ongoing construction and renovation throughout the area occasioned by the completion of the new home stadium for the Chicago Fire. In the commission of his racketeering acts, Kaput has exercised a considerable degree of personal direction, autonomy and control and otherwise knowingly and creatively facilitated the goals of the conspiracy. The specific acts committed by Kaput in regard to the ongoing phase of the conspiracy are within the exclusive knowledge of Kaput

and the other defendants but will be revealed in the course of discovery.

70. Defendant Butch Sloan is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and control of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of racketeering activity, including:

A. In or about November of 1999, Sloan met with Landek and otherwise agreed and arranged to begin a campaign of harassment of the Plaintiff, in his official capacity as a Village Police Officer, amounting to official misconduct by Sloan;

B. On October 14, 2000, Sloan appeared at the WGD and issued citation #P047766 ("no valid food permit"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

C. On or about December 14, 2000, Sloan appeared at the WGD and issued citation #P045556 ("inadequate ventilation for kerosene heaters"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

D. On December 14, 2000, Sloan appeared at the WGD and issued citation #P045547 ("no storage of combustible material allowed"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

E.     On December 14, 2000, Sloan appeared at the WGD and issued citation #P045548 ("no fuel fired heaters used without permission"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

F.     On December 14, 2000, Sloan appeared at the WGD and issued citation #P045550 ("no adequate ventilation while using kerosene"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

G.     On December 14, 2000, Sloan appeared at the WGD and issued citation #P045549 ("heating devices shall comply with standards"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

H.     On August 29, 2001, Sloan appeared at the WGD and issued citation #P047646 ("piles of broken concrete, timbers, stone"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

I.     On December 8, 2001, Sloan appeared at the WGD and issued citation #P046895 ("no business license"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

J.     On December 8, 2001, Sloan appeared at the WGD and issued citation #P046896 ("no certificate of occupancy"), said citation being disingenuous and picayune and

issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan;

K.      On December 8, 2001, Sloan appeared at the WGD and issued citation #P046897 ("unlawful to deface sticker"), said citation being disingenuous and picayune and issued in furtherance of the racketeering scheme, said citation resulting in no conviction, being official misconduct by Sloan.

L.      In addition to the foregoing acts of racketeering and related misconduct by Sloan, on information and belief, this defendant has continued to be employed by the Enterprise and to commit racketeering acts in its furtherance, in his capacity as a Police Officer employed by the Village, including issuing citations for disingenuous and unfounded reasons and otherwise facilitating the conspirators' goals of (i) maximizing their personal gains from the ongoing business boom occasioned by the impending completion of the new home stadium for the Chicago Fire; while (ii) ensuring that any entity or individual in the path of such a goal will be harassed, ticketed, enjoined, summonsed, and generally hounded out of business just as the Plaintiff was treated here. In the commission of his acts as set forth herein, Sloan has exercised a considerable degree of personal direction, autonomy and control and otherwise knowingly and creatively facilitated the goals of the conspiracy. The remaining racketeering-related acts committed by Sloan in regard to the latest stage of the Racketeering Conspiracy are within the exclusive knowledge of Sloan and other defendants but will be revealed in the course of discovery.

71.      Defendant Alan Gustafson is employed by and associated with the Enterprise, and with intent to force, cheat, or otherwise defraud the Plaintiff into surrendering his ownership and

control of the World Golf Dome, and to accomplish other improper and illegal objectives of the Racketeering Conspiracy, has engaged and continues to engage in actions constituting a pattern of racketeering activity, including:

    A.    In or about August of 2003, Gustafson met with Pascente, Mazutis, Landek and other agents of the Enterprise and otherwise agreed that the Plaintiff would be subjected to mafia-style intimidation in order to force him to sign over his interest in the WGD, amounting to a participation in a conspiracy to violate the Plaintiff's civil rights, violation of a fiduciary duty owed to the Plaintiff, and the abetting of official misconduct by Gustafson;

    B.    On or about September 9, 2003, Gustafson met with Reynolds and other agents of the Enterprise, and otherwise proposed and arranged that Gustafson would turn over to Reynolds the corporate books and stock certificates of the WGD in order to facilitate the racketeering scheme, amounting to violation of a fiduciary duty owed to the Plaintiff;

    C.    Use of the United States Mail, on or about September 10, 2003, Gustafson composed and sent a letter to his corporate Attorney Thomas Morrison, instructing Morrison to turn over the corporate books and stock certificates of the WGD to Reynolds. Gustafson intended that this letter would help expedite the racketeering scheme, amounting to mail fraud and the violation of a fiduciary duty owed to the Plaintiff;

    D.    On or about September 14, 2003, Gustafson met with Reynolds and Mazutis and otherwise helped to formulate a plan that Gustafson would (i) forge the Plaintiff's name to an "agreement" that transferred the Plaintiff's interest in the WGD to Gustafson; and (ii) prepare a second agreement that transferred the ownership of the WGD to Mazutis;

E. On September 15, 2003, Gustafson forged the Plaintiff's signature to a "settlement agreement" which purported to transfer the Plaintiff's 50% ownership share of the WGD to Gustafson, in return for no monetary consideration whatsoever, amounting to forgery, contractual fraud and the violation of a fiduciary duty owed to the Plaintiff;

F. On September 15, 2003, after gaining full ownership of the WGD through forgery and fraud, Gustafson handwrote and signed an agreement which purported to transfer to Mazutis the right to buy the WGD for $1.25 million;

G. On or about October 30, 2003, Gustafson met with Landek, Mazutis, Cainkar, and other agents of the Enterprise, and otherwise participated in the formulation of a 'fall-back' plan for the implementation of this objective of the conspiracy, whereby the Village would pay Gustafson $1.2 million for the WGD and pay $450,000 to Mazutis;

H. On October 31, 2003, as a consequence of the racketeering activities of Gustafson and other defendants as set forth above, the Village entered into an agreement to pay Gustafson $1.2 million for the WGD, with net proceeds of $242,367 payable to Mazutis, in two installments;

I. In February of 2004, the Village made its second and final installment payment of $62,337 to Mazutis, thus finalizing the wrongful and fraudulent transaction which Gustafson's racketeering-related acts had helped to implement and enable.

J. In addition to Gustafson's foregoing acts in furtherance of the conspiracy, on information and belief, Gustafson has continued to be employed by the Enterprise and to commit racketeering acts on its behalf, inclusive of additional acts of mail fraud which are currently within Gustafson's exclusive knowledge (and that of other defendants) but which

53

will be revealed in the course of discovery. Gustafson's racketeering-related activity is all the more objectionable, considering that he violated a position of trust and fiduciary obligation vis-à-vis the Plaintiff in participating in the defendants' scheme. On information and belief, Gustafson has exercised a considerable degree of direction, management and control of his activities in furtherance of the conspiracy, and has been delegated responsibilities by other defendants in keeping with Gustafson's "insider" status as a partner and fiduciary of the Plaintiff. On information and belief, Gustafson has continued to be of service to the Enterprise and conspiracy in its ongoing phase, in regard to the manifold opportunities for the advancement of the defendants' personal profit and other illicit gains by and through the $18.5 million in estimated annual income which the new stadium for the Chicago Fire will bring to the Village.

72.     Plaintiff, JOHN LaFLAMBOY, has suffered losses to his business and property in an amount in excess of SIX MILLION DOLLARS ( $6,000,000.00), said sum being calculated on the basis of the Plaintiff's estimated lost income from the World Golf Dome for the 1999-2005 period, incurred as a direct and proximate consequence of the defendants' foregoing racketeering-related acts and scheme. The Plaintiff is seeking damages against the defendants, jointly and severally, predicated upon such losses, pursuant to the provisions of the civil RICO Act, 18 U.S.C § 1962(c).

WHEREFORE, the Plaintiff, JOHN LaFLAMBOY, prays for entry of judgment in his favor and against the Defendants Steven Landek, Kenneth DeVries, Steven Reynolds, Adriana Mazutis, Fred Pascente, Vincent Cainkar, John Curry, Joseph Kaput, Butch Sloan and Alan Gustafson, individually and collectively, as follows:

54

A.    For his damages as proven as trial;

B.    For treble damages;

C.    For his costs;

D.    For reasonable attorneys' fees; and

E.    For such other and further relief as this Court may see fit to allow.

## COUNT II: CIVIL RICO, 18 U.S.C § 1962(d)
### CONSPIRACY

1-72.  The Plaintiff adopts, restates, and incorporates the foregoing paragraphs 1-72 as though fully set forth herein.

73.  Defendants Landek, DeVries, Reynolds, Mazutis, Pascente, Cainkar, Curry, Kaput, Sloan and Gustafson have each agreed and conspired, in violation of 18 U.S.C § 1962(d), to engage in a pattern of racketeering activity [in violation of 18 U.S.C § 1962(c)] with the intention of cheating, defrauding, and otherwise forcing the Plaintiff to give up his ownership rights to the WGD, and to accomplish the related goals of the Racketeering Conspiracy. There is a relationship between the actions that the various Defendants have taken and the overall scheme and various objectives of the conspiracy. There has been continuity in regard to the pattern of acts in furtherance of the conspiracy, which commenced in or about May of 1999 [shortly after Landek was elected Village Mayor] and is still ongoing as of the current date. A continuing threat of criminal activity exists in regard to the Racketeering Conspiracy, which has been facilitated by and through the Enterprise, and which continues, via the activities of each Defendant, to accomplish its objectives in regard to the latest phrase of the conspiracy, wherein illicit gains are being garnered for the members of the conspiracy via the estimated $18.5 million in annual income which the new home stadium for the Chicago Fire has brought to the community. While the full details of the Racketeering Conspiracy

are within the sole knowledge and control of the Defendants, it is possible to determine that each Defendant furthered the Enterprise, and directly or indirectly participated as set forth above.

74.     The Defendants, and each of them, agreed that their actions would be committed on behalf of the Racketeering Conspiracy, and they agreed to participate in the schemes of the Enterprise, agreeing and knowing that two or more predicate acts would be committed, based on the factual allegations as set forth above.

WHEREFORE, the Plaintiff, JOHN LaFLAMBOY, prays for entry of judgment in his favor and against the Defendants Steven Landek, Kenneth DeVries, Steven Reynolds, Adriana Mazutis, Fred Pascente, Vincent Cainkar, John Curry, Joseph Kaput, Butch Sloan and Alan Gustafson, individually and collectively, as follows:

A.     For his damages as proven as trial;

B.     For treble damages;

C.     For his costs;

D.     For reasonable attorneys' fees; and

E.     For such other and further relief as this Court may see fit to allow.

### COUNT TWO
### (Complaint pursuant to 42 U.S.C.A. § 1983)

NOW COMES the Plaintiff, JOHN LaFLAMBOY, by and through his attorneys, DENNIS A. BERKSON, MICHAEL D. ETTINGER, and RICHARD S. ZACHARY, and complaining of the Defendants Steven Landek, in his official capacity as Mayor of the Village of Bridgeview; Kenneth DeVries, individually; Steven Reynolds, individually; Adriana Mazutis, individually; Fred Pascente, individually; Vincent Cainkar, in his official capacity as the attorney for the Village of Bridgeview;

56

John Curry, in his official capacity as a Building Inspector for the Village of Bridgeview; Joseph Kaput, in his official capacity as Director of Building and Inspection Services for the Village of Bridgeview; Butch Sloan, in his official capacity as a police officer for the Village of Bridgeview; and Alan Gustafson, individually, states as follows:

1-56. The Plaintiff adopts, restates, and incorporates the preceding paragraphs 1-56 [i.e., in his foregoing RICO complaint] as though fully set forth herein.

57.     As the above allegations demonstrate, the Plaintiff has been deprived of his rights guaranteed by the Constitution and laws of the United States by the Defendants Steven Landek, Kenneth DeVries, Steven Reynolds, Adriana Mazutis, Fred Pascente, Vincent Cainkar, John Curry, Joseph Kaput, Butch Sloan and Alan Gustafson, jointly and severally, acting under color of state and municipal law and in furtherance of a scheme and conspiracy to exert wrongful and illegal pressure upon Plaintiff to force him to give up his ownership of the World Golf Dome. The rights of the Plaintiff, of which he was wrongfully deprived by the Defendants, include (i) his right to own property; (ii) his right to make a living; and (iii) his right to pursue his affairs and manage an enterprise without being harassed, cheated, ticketed, enjoined, litigated, strong-armed, coerced, and finally defrauded out of business.

58-67. The Plaintiff adopts, restates, and incorporates the above preceding paragraphs 62 through 71 [i.e., in his RICO complaint] as and for paragraphs 58 through 67, as though fully set forth herein.

68.     The acts of the Defendants, jointly and severally [including the actions of both Village officials and private individuals] which sufficed to deprive Plaintiff of his rights were sanctioned and authorized by the municipality of the VILLAGE OF BRIDGEVIEW, by and through the actions of

(i) Village Mayor Steven Landek; (ii) the attorney for the Village, Vincent Cainkar; (iii) the Director of Building and Inspection Services for the Village, Joseph Kaput; (iv) Code Enforcement Inspector for the Village, John Curry; and (v) Officer Butch Sloan of the Village Police Department.

69.  The acts of those Defendants being sued in their official capacities [i.e., Landek, Cainkar, Curry, Kaput, and Sloan] involve the enforcement of express policies and/or widespread practices and customs of the Village of Bridgeview, under color of state and municipal law, and were caused, authorized and/or implemented by a person with final policy-making authority for the Village, namely Mayor Steven Landek.

70.  The acts of those Defendants being sued as individuals [i.e., DeVries, Reynolds, Mazutis, Pascente and Gustafson] were undertaken by such individuals as willful participants in a joint action and conspiracy with the municipality of the Village of Bridgeview and its officials, representatives and agents, under color of state and municipal law, with significant involvement by the municipality, and were caused, authorized and/or implemented by a person with final policy-making authority for the municipality, namely Mayor Steven Landek.

71.  Plaintiff has been deprived of his rights guaranteed by the Constitution and laws of the United States by the Defendants, jointly and severally, acting in furtherance of one or more of the policies, customs and/or practices of the municipality:

> (A)  The express policy and widespread practice of issuing official citations, warnings, complaints, sanctions, and fines for purported violations of local laws and ordinances;
>
> (B)  The express policy and widespread practice of conducting official inspections of buildings for purported conformity with local building codes;

(C)   The policy, practice and custom of permitting variances and exceptions to local building codes and municipal ordinances;

(D)   The policy, practice and custom of hiring private individuals to work as employees and "consultants" for the Village Mayor;

(E)   The policy and practice of enforcing local tax regulations and ensuring compliance with the same;

(F)   The policy, practice and custom of obtaining a valuation, in an appropriate and lawful manner and for appropriate and lawful purposes, of private property;

(G)   The policy, practice and custom of implementing, overseeing and approving the sale of buildings by private individuals to the municipality;

(H)   The policy, practice and custom of encouraging sports franchises to make their home base in the Village of Bridgeview;

(I)   The policy and practice of utilizing the doctrine of eminent domain for appropriate and lawful purposes;

(J)   The practice, policy and custom of purchasing, obtaining, building, renovating, owning and overseeing sports stadiums and all-weather practice facilities in the Village of Bridgeview;

(K)   The practice, policy and custom of employing and utilizing the attorney for the Village, the Village Building Inspectors and other public officials to implement, effectuate and carry out the directives, decisions, and projects of the Village Mayor.

72.     As a direct and proximate consequence of the Defendants' joint and several actions in furtherance of one or more of the foregoing policies, practices and customs of the municipality, over a period in excess of four years, the Plaintiff was intermittently and consistently hassled, harried, bogus-ticketed, bogus-inspected, strong-armed, singled out and persecuted, with the purpose of eventually forcing him to give up his rights to the sports and events venue that he had envisioned, planned and developed in the Village.

73.     As a direct and proximate consequence of the Defendants' foregoing actions under color of state and municipal law, in deprivation of his rights under the Constitution and laws of the United States, the Plaintiff has suffered losses and damages in excess of SIX MILLION DOLLARS ($6,000,000.00). The Plaintiff is seeking an award against the Defendants, jointly and severally, predicated upon such losses, pursuant to the provisions of the 42 U.S.C.A. § 1983.

WHEREFORE, the Plaintiff, JOHN LaFLAMBOY, prays for entry of judgment in his favor and against the Defendants Steven Landek, Kenneth DeVries, Steven Reynolds, Adriana Mazutis, Fred Pascente, Vincent Cainkar, John Curry, Joseph Kaput, Butch Sloan and Alan Gustafson, individually and collectively, as follows:

A.     For his damages as proven as trial;

B.     For his reasonable attorneys' fees;

C.     For his costs;

D.     For such other relief as this Court may see fit to allow.

### COUNT THREE
### (Pendent State Claim)

NOW COMES the Plaintiff, JOHN LaFLAMBOY, by his attorneys, DENNIS A. BERKSON, MICHAEL D. ETTINGER, and RICHARD S. ZACHARY, and complaining of the Defendant KENNETH DeVRIES, states as follows:

1.     At all times pertinent hereto, the Plaintiff was a businessman residing in Cook County, Illinois, who owned, managed, and controlled a sports and events venue formerly known as the World Golf Dome (hereinafter also "WGD"), located southeast of the intersection of 89th Street and 77th Avenue in the Village of Bridgeview, Illinois.

2.     At all times pertinent hereto, the WGD included a clubhouse restaurant, located on the premises of the WGD, as well as an adjacent parking lot for the use of the patrons of the clubhouse restaurant and the World Golf Dome.

3.     In or about August of 1999, the Defendant KENNETH DeVRIES (hereinafter "DeVries") contacted the Plaintiff in regard to the former's prospective operation of the clubhouse restaurant located on the premises of the WGD.

4.     In the course of negotiations, it was agreed that DeVries would operate the clubhouse restaurant under a landlord-tenant agreement with the Plaintiff.

5.     On October 28, 1999, DeVries signed and executed a five-year Clubhouse Lease with the Plaintiff (hereinafter "Lease"), pursuant to which DeVries would operate the clubhouse restaurant [which was henceforth known as the "Scoreboard"] and assume various obligations as the Plaintiff's tenant over the duration of the Lease.

6.     The Lease provided, in pertinent part, as follows:

61

(a)     That DeVries agreed to rent said premises, effective November 15, 1999, from the Plaintiff[1] for a five-year period, with a rent of approximately $3,000 per month;

(b)     That DeVries agreed to pay his pro rata share of the real estate taxes incurred by the World Golf Dome, on a monthly basis, based upon the square footage of the Scoreboard restaurant and other factors, within 30 days of notice of issuance of notice;

(c)     That DeVries agreed to sealcoat and stripe [i.e., re-surface] the parking lot on a yearly basis at DeVries' expense;

(d)     That upon a default by DeVries in regard to any of his obligations under the Lease, any and all costs, fees and charges incurred by the Plaintiff, including his attorneys' fees, in an action to enforce said obligations, would be paid by DeVries.

7.     That, at the time of the execution of the Lease, the parties [Plaintiff and DeVries] calculated and agreed that DeVries' pro rata share of the real estate taxes incurred by the World Golf Dome was to be $40,000 per year over the duration of the Lease, said sum being approximately 47 per cent of the WGD's real estate taxes of approximately $85,000 per annum.

8.     That, following the execution of the Lease, to and through November of 2003, DeVries proceeded to rent and occupy the Scoreboard restaurant as Plaintiff's tenant and otherwise remained on said premises as contemplated in the Lease.

---

[1]The Plaintiff was 50% owner of the WGD, which was held by a land trust. On the Lease, the Plaintiff is named as de facto Lessor.

9. That notwithstanding DeVries' obligation, pursuant to the Lease, to pay $3,000 per month in rent for his occupancy of said premises, DeVries failed and refused to pay rent for the months of September through November of 2003, inclusive.

10. That notwithstanding DeVries' obligation, pursuant to the Lease, to pay $40,000 per year to the Lessor [i.e., Plaintiff] as his pro rata share of the real estate taxes assessed upon the World Golf Dome, DeVries failed and refused to pay any portion whatsoever of the real estate taxes incurred by the WGD for the years 2000 through 2003, inclusive. DeVries persisted in such willful noncompliance despite receiving timely notice of each and every installment due.

11. That notwithstanding DeVries' obligation, pursuant to the Lease, to sealcoat and stripe the parking lot on an annual basis, DeVries failed and refused to sealcoat and stripe the parking lot on any occasion throughout the 1999-2003 period.

12. That, as a direct and proximate consequence of DeVries' willful refusal to sealcoat and stripe the parking lot as required by the Lease, the Plaintiff was forced to sealcoat and stripe the parking lot during the 2001 year, incurring and paying costs and charges of $5,800.00.

13. That, when Plaintiff undertook to sealcoat the parking lot in 2001, DeVries went so far as to file an injunctive action in an attempt to halt the project. Plaintiff was forced to incur additional consequential expenses of $800.00 in legal fees and costs in defending against this action brought by DeVries, an action belied by DeVries' own responsibility to undertake, and pay for, such a project under the terms of the Lease.

14. As a consequence of DeVries' failure and refusal to comply with his foregoing obligations under the Lease, Plaintiff has incurred losses and damages in the approximate amount of One Hundred Seventy-Five Thousand Six Hundred Dollars ($175,600.00).

15.     Plaintiff has made repeated demands upon DeVries for payment of said amounts due. DeVries has refused and failed to pay any portion thereof to the Plaintiff.

16.     This Court has pendent and/or supplemental jurisdiction of this claim under 28 U.S.C. § 1367.

WHEREFORE, the Plaintiff, JOHN LaFLAMBOY, prays for entry of judgment in his favor and against the Defendant KENNETH DeVRIES, as follows:

A.     For his damages as proven at trial;

B.     For reasonable attorneys' fees;

C.     For his costs;

D.     For such other relief as this Court may see fit to allow.

Respectfully submitted,

_____
Richard S. Zachary, one of Plaintiff's attorneys

Dennis A. Berkson
Michael D. Ettinger
Richard S. Zachary
Attorneys for PLAINTIFF
180 North LaSalle, Suite 1925
Chicago, Illinois 60601
(312) 726-7402