**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JOHN LaFLAMBOY,** )<br><br>Plaintiffs, )<br><br>v. )<br><br>**STEVEN LANDEK, KENNETH DEVRIES,** )<br>**STEVEN REYNOLDS, ADRIANA MAZUTIS,** )<br>**FRED PASCENTE, VINCENT CAINKAR,** )<br>**JOHN CURRY, JOSEPH KAPUT, BUTCH** )<br>**SLOAN, ALLAN GUSTAFSON and the** )<br>**VILLAGE OF BRIDGEVIEW,** )<br><br>Defendants. ) | No. 05 C 4994<br><br>Honorable Amy J. St. Eve |

## MEMORANDUM OPINION AND ORDER

Before the Court are four motions for summary judgment—in each case, the parties move as to all counts that name them. Defendants Steven Landek, John Curry, Joseph Kaput, Butch Sloan, and Steven Reynolds, (the "Village Defendants"), along with Defendant the Village of Bridgeview (the "Village"), move for summary judgment on Counts I, II, and III and also move to strike Plaintiff's responses to their Rule 56.1 Statement. (R. 415-1.) Defendant Vincent Cainkar ("Cainkar") separately moves for summary judgment as to Counts II and III; Defendant Allan Gustafson ("Gustafson") moves for summary judgment as to Counts II, III, and IV; and Defendant Kenneth DeVries ("DeVries") separately move for summary judgment as to Counts II and V. For the reasons discussed below, the Court grants summary judgment in part on Count I, denies summary judgment as to Count II; grants summary judgment on Count III as to all Defendants; and denies summary judgment as to Counts IV and V. In addition, the Court grants in part and denies in part the Village Defendants' motion to strike.

# BACKGROUND

## I.      Procedural Posture – Fourth Amended Complaint

Plaintiff John LaFlamboy's Fourth Amended Complaint ("FAC") asserts five causes of action against varying Defendants.[1]

First, Count I alleges a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, pursuant to 18 U.S.C. § 1964(c), against the Village Defendants, Steven Reynolds, and Fred Pascente (collectively, "the RICO Defendants").[2]  Plaintiff asserts in Count I that beginning in May 1999, and extending through at least October 2005, the RICO Defendants violated RICO, 18 U.S.C. § 1962(c), by participating in a pattern of racketeering activity involving Plaintiff's former business, the World Golf Dome ("WGD").

In Count II, Plaintiff alleges that the RICO Defendants, along with Defendants Allan Gustafson, Vincent Cainkar, Kenneth DeVries, and Adriana Mazutis violated 18 U.S.C. § 1962(d) by conspiring to violate RICO.[3]  In particular, Plaintiff alleges that these Defendants agreed and conspired "to engage in a pattern of racketeering activity with the intention of cheating, defrauding, and otherwise forcing the Plaintiff to give up his ownership and control of

---

[1]  As an initial matter, although Plaintiff continues to assert Count I against Defendant Steven Reynolds, Defendant Reynolds apparently died during the pendency of this litigation. Plaintiff has filed neither a Suggestion of Death nor moved to substitute pursuant to Rule 25. The Court hereby grants Plaintiff fourteen (14) days from the date of this order to 1) file a Suggestion of Death, thus triggering the 90-day period of time for substitution pursuant to Rule 25; 2) dismiss Mr. Reynolds from the case; or 3) file an appropriate motion seeking other relief, as necessary.  Failure to do so will result in dismissal of Mr. Reynolds from this case.

[2] The Court previously dismissed Count I against Defendants Allan Gustafson, Kenneth DeVries, Vincent Cainkar, and Adriana Mazutis.  (R. 101 at 8; R. 269-1.)  Mr. Pascente did not join the instant motions or file a motion of his own.

[3]  Defendant Adriana Mazutis did not joint the instant motions or file a motion of her own.

the WGD." (R. 299-1, Fourth Am. Compl. ¶ 86.) In Count III, Plaintiff asserts a 42 U.S.C. § 1983 claim, alleging that the RICO Defendants and the Village violated Plaintiff's constitutional rights, including his Fifth Amendment right not to be deprived of property without just compensation; and his Fourteenth Amendment right not to be deprived of property or livelihood without due process of law. In essence, Plaintiff alleges 1) that the Village Defendants' practice of issuing citations, denying permits, and conducting unwarranted inspections interfered with Plaintiff's business; and 2) the Village Defendants' schemes to obtain control of the WGD forced Plaintiff to give up his rights to his property. Plaintiff argues that 42 U.S.C. § 1983 entitles him to damages for these Constitutional violations.

Additionally, Plaintiff asserts a breach of fiduciary duty claim (Count IV) against Defendant Gustafson. Plaintiff and Gustafson formerly partnered in connection with the WGD, and Count IV alleges that has Defendant Gustafson breached his fiduciary duty to Plaintiff in connection with their partnership.

Finally, in Count V, Plaintiff alleges a state law breach of contract claim against Defendant DeVries. Plaintiff contends that DeVries breached a rental agreement entered into by DeVries and Plaintiff concerning leasing of space at the WGD.

## II.     The Parties' Rule 56.1 Statements of Fact

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Pursuant to Local Rule 56.1(a)(3), the moving party

must provide a concise "statement of material facts as to which the moving party contends there is no genuine issue." (L.R. 56.1; *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). The non-moving party must respond by admitting or denying each and every factual statement proffered by the moving party with specific references to the record. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Should the non-moving party fail to do so, the court may deem all *well-supported* facts set forth in the movant's statement to be admitted. *See Ciomber*, 527 F.3d at 644; *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005); *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). ("The district court was entitled to take these facts as uncontested, as the local rule provides"); *Scott v. Edinburgh*, 346 F.3d 752, 759 (7th Cir. 2003).

The operative phrase here is "well-supported." Specifically, litigants must support facts with specific references to the record and evidence admissible at trial. As such, the Court may opt to disregard facts presented in a manner that does not comply with Rule 56.1. *See Ciomber*, 527 F.3d at 643; *see also Roger Whitmore's Auto. Serv., Inc. v. Lake County*, 424 F.3d 659, 664 n.2 (7th Cir. 2005) ("It is not the duty of the district court to scour the record in search of material factual disputes . . . .") (collecting cases). In addition, the Court will not consider documents that would not be admissible at trial when ruling on summary judgment. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). A district court is "entitled to expect strict compliance" with Rule 56.1. *See, e.g.*, *Ciomber*, 527 F.3d at 643; *Cichon,* 401 F.3d at 809 (collecting cases); *Ammons*, 368 F.3d at 817 (quoting *Bordelon*, 233 F.3d at 527).

### A.     Plaintiff's Response to Defendant Gustafson's Rule 56.1 Statement

Plaintiff failed to timely respond to Defendant Gustafson's Undisputed Statements of Material Fact. Plaintiff attempted to file a response to Defendant Gustafson's Rule 56.1 statement (R. 396-1), but did so eight days after the court-imposed deadline of July 22. (R. 342-1.) As such, and based on the Plaintiff's pattern of dilatory filings, repeated inattention to Court orders, non-compliance with Court rules, and misrepresentation, the Court denied Defendant's motion to file these documents *instanter*. (R. 398-1.) The Court deems all of Gustafson's well-supported statements of fact admitted. *Ciomber*, 527 F.3d at 644; *Cichon*, 401 F.3d at 810; *Schrott*, 403 F.3d at 944.

**B.      Plaintiff's Response to Defendant Cainkar's Rule 56.1 Statement**

In response to nearly all of Cainkar's statements of fact, Plaintiff merely denies the statement without proffering "specific references" to the record to support his general denials as required by Rule 56.1. Plaintiff attempted to file an amended response to Cainkar's Statement (R. 391-1), but the Court struck that entry as dilatory and non-compliant. (R. 403-1.) As such, Plaintiff has admitted each of the supported facts in Cainkar's Rule 56.1 Statement at paragraphs 5-7, 10, and 12-63. Despite the Village Defendants' argument to the contrary, however, facts deemed admitted by Plaintiff for the purpose of Defendant Cainkar's motion for summary judgment are ***not*** deemed admitted for the purpose of the Village Defendants' motion. The Village Defendants must meet their own respective burdens.

**C.      The Village Defendants' Rule 56.1 Statement**

Defendants attack Plaintiff's Rule 56.1 statements in both their respective summary judgment papers and in the Village Defendants' motion to strike. Having fully considered

Defendants' arguments, the Court largely agrees that Plaintiff has fallen far short of his Local Rule 56.1 obligations. The Village Defendants, however, are not without fault.

To begin with, the parties routinely cited exhibits that went unauthenticated either by deposition testimony or affidavit. Rule 56(e) requires that documents be "authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Scott*, 346 F.3d at 759-760, n.7 (quoting 10A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2722, at 379-80 & 382-84 (1998)). This requirement applies to all documentary exhibits, including, for example, expert reports. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (excluding on summary judgment an expert report that was introduced "without any supporting affidavit verifying its authenticity.").

Next, both Plaintiff and the Village Defendants routinely relied on hearsay evidence. But "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial," *Eisenstadt*, 113 F.3d at 742. The Seventh Circuit excepts from this prohibition only affidavits and depositions. *Eisenstadt*, 113 F.3d at 742.[4] Both parties failed to justify their reliance on hearsay or provide sufficient information (via affidavits or otherwise) to bring the hearsay evidence within one of the exceptions provided by the Federal Rules of Evidence.

---

[4] "[A]ffidavits and depositions, which (especially affidavits) are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, ...provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live. There is no similar dispensation for newspaper or magazine articles, which not being attested are considered less reliable than affidavits or depositions." *Id.*

In addition, both parties continually "disagree" with the other party's statements of fact. Absent a denial supported by specific reference to the record, mere disagreement is insufficient to support or defeat summary judgment. *See Montano v. City of Chi.*, 535 F.3d 558, 569 (7th Cir. 2008) (citing *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003)).

Moreover, a proper Rule 56.1 statement attaches well-organized exhibits that are what the parties claim them to be. The parties in this case submitted over 500 separate exhibits, representing thousands of pages of additional information. Both Plaintiff and the Village Defendants routinely cited to exhibits that were non-existent or mis-labeled. In each case, where the Court was confronted with a non-conforming, argumentative, or unsupported statement of fact, that fact was stricken.

### D. Plaintiff's Response to the Village Defendants' Rule 56.1 Statement

Although Plaintiff did file responses to the Rule 56.1 Statement of the Village Defendants, (R. 373-1; R. 392-1; 395-1),[5] many of his responses fail to comply with Rule 56.1. First, in responding to each of these three Rule 56.1 Statements, Plaintiff initially failed to file any exhibits in support of his factual assertions.[6] Instead, Plaintiff delivered a "courtesy copy" binder of untabulated exhibits—eight days late, and in violation of Local Rule 5.2(c).[7] This failure potentially dooms Plaintiff's opposition to Defendants' 56.1 statements, because a party

---

[5] Plaintiff attempted to file an amended response to the Village Defendants' Statement (R. 391-1), but the Court struck that entry as dilatory and non-compliant. (R. 403-1.)

[6] It appears that Plaintiff may have attempted to file these exhibits on July 23, 2008, but failed to properly do so in compliance with the rules. (*See* R. 374-1 through 382-1.) Given Plaintiff's non-compliance, the Court ordered the Clerk of Court to remove entries 374 through 382 from the docket. (R. 389-1.)

[7] Upon Plaintiff's August 29, 2008 motion, the Court filed Plaintiff's exhibit binder with the clerk. (*See* R. 424-1, R. 434-1.)

facing summary judgment must "put up or shut up." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). Even considering the binder of non-filed exhibits, the majority of Plaintiff's "disputed facts" are merely argumentative assertions that lack specific citations to the record. In some instances, Plaintiff identified genuine factual disputes but pointed to exhibits that either were not provided to the Court (*see, e.g.*, R. 434-1, Pl.'s Ex. 81), represented something other than what Plaintiff contended (*see, e.g.*, 434-1, Pl.'s Exs. 58, 59, 60, 66, 107, 108), or did not contain the pages for which Plaintiff cited them (*see, e.g.* 434-1, Pl.'s Exs. 36, 38, 40, 59, 111(b)). It is not the Court's responsibility to root through the record to make Plaintiff's case for him. *See Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1001 (7th Cir. 2004).

Plaintiff also relies on broad, argumentative affidavits that are unsupported by facts or other citations to the record. Affidavits must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters stated." Fed. R. Civ. P. 56(e)(1); *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000). Plaintiff submitted transcripts of interviews with Tim Sparrow, Ken Keysor, and David Eldridge, (*see, e.g.,* R. 434-1, Pl.'s Exs. 39, 40, 41, 105), and an unsigned statement purporting to be the "O'Connell Declaration" (R. 434-1, Pl.'s Ex. 28), each of which lacked signatures, authentication, or any evidentiary foundation whatsoever.[8] *Id.*; *see Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 912 (7th Cir. 2002) (an affidavit not signed by affiant fails to comply with Rule 56(e)). The "declarations" also contain multiple levels of inadmissible

---

[8] Nor were the "declarations" made under penalty of perjury. *See* 28 U.S.C. § 1746 ("wherever... any matter is required or permitted to be supported... by... affidavit, such matter may... be supported...by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury...").

hearsay and recite speculation clearly outside the declarant's personal knowledge. *See Haywood v. Lucent Techs.*, 323 F.3d 524, 533 (7th Cir. 2003) (affirming district court's striking of hearsay statements in the context of summary judgment); *Woods*, 234 F.3d at 987 (document was inadmissible under 56(e) where it contained statements regarding matters not within the declarant's personal knowledge). As such, much of the Sparrow, Keysor, Eldridge, and O'Connell "declarations" are inadmissible, and thus improper under Rule 56(e).

Plaintiff also relies heavily on newspaper articles for support of his rebuttals to paragraphs 77, 104, 108, 116, 118, and 123. (R. 434-1, Pl.'s Exs. 93, 94). Although Plaintiff half-heartedly argues otherwise, he clearly offers the newspaper articles for the truth of the matters asserted therein, and they are therefore inadmissable. *See* Fed. R. Evid. 801(c); *Chi. Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 654 (7th Cir. 2001) ("The evidence consists of a newspaper article, which is inadmissible hearsay..."); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (newspaper article inadmissible hearsay in summary judgment proceedings); *see also Galdikas v. Fagan*, 342 F.3d 684, 695 (7th Cir. 2003) (parties cannot rely on inadmissible hearsay in summary judgment opinions). Similarly, portions of Plaintiff's affidavit, (R. 434-1, Pl's Ex. 86 at ¶¶ 6, 7, 15), improperly rely on the newspaper articles and other hearsay evidence, such as a televised interview with Mayor Landek, which the Court cannot consider for the truth of the matters asserted. *See Potter*, 445 F.3d at 1009.[9] Without the

---

[9] Plaintiff argues that one source contains an admission by party opponent Mayor Landek. Such a statement might be admissible under Federal Rule of Evidence 801, but because the statement was actually made by a third-party out-of-court declarant quoting the Mayor, and not the Mayor himself, it is inadmissible as double hearsay.

hearsay evidence, Plaintiff's responses to paragraphs 77, 104, and 108 are unsupported by any facts, and the Court therefore deems those paragraphs admitted.

Further confusing things, many of Plaintiff's responses to the Village Defendants' Rule 56.1 Statement refer back, or otherwise incorporate, responses to other statements of fact. Some of these incorporating responses, namely paragraphs 21 and 22, point to a number of other responses, some of which admit, others of which deny, Defendants' statements. Many of the incorporating responses (paragraphs 25, 28, 29, and 89), for example, fail to specifically address the facts for which Plaintiff apparently incorporated them, while others (paragraphs 84, 85, and 86) incorporate non-existent responses. Because the Court cannot determine the meaning of these responses, and because the responses fail to comply with Rule 56.1(b)(3)(A) and (B), Plaintiff has admitted the well-supported facts contained in the Village Defendants' Statement at paragraphs 21, 22, 25, 28, 29, 84, 85, 86, 89 and 109-111.

Moreover, Plaintiff's attempts to introduce new facts in the context of his responses to Defendants' Rule 56.1 statements are also improper. Plaintiff's responses to at least Village Defendants' paragraphs 61, 69, 74, and 75 attempt to introduce new facts in contravention of the Local Rules, which require delineation of additional facts in a separate statement. *See* Loc. R. 56.1(b)(3); *Ammons*, 368 F.3d at 817 ("Rule 56.1 envisions a separate statement of additional facts."). As such, the Court strikes these "additional facts" for failure to comply with Local Rule 56.1(b)(3). *See Ammons*, 368 F.3d at 817 (holding that district court did not abuse its discretion by striking facts included in non-movant's responsive memorandum).

Given Plaintiff's evasive responses, improper arguments, mis-citations, lack of citations, missing exhibits, reliance on inadmissible evidence, and failure to address Defendants'

statements of fact, Plaintiff has admitted the Village Defendants' statements of fact, to the extent that the statements are well-supported, at paragraphs 3, 7-12, 14, 16, 18, 19, 23, 24, 27, 30, 32, 34, 36, 41, 43-45, 50-52, 53, 57, 61, 62-65, 66, 70, 73, 75, 80, 81, 82, 83-86, 89-92, 95-98, 106, 108, 115, 116, 120, and 121.

### E. Plaintiff's Additional Statement of Facts

Rule 56.1 permits the non-moving party to file a statement of additional facts to overcome summary judgment. *See* Loc. R. 56.1(b)(3). Here, Plaintiff filed such a document (R. 394-1), but for many of the reasons discussed above, it fails to comply with Local Rule 56.1. The Village Defendants have moved to strike Plaintiff's Statement of Additional Facts. (R. 415-1.)[10]

Plaintiff's additional facts lack supporting exhibits, rely on inadmissible evidence, and are rife with improper arguments and erroneous citations. As such, the Court strikes the first sentence of the first paragraph 4[11] in Plaintiff's Additional Statement of Fact as unsupported by evidence. The Court also strikes the last two sentences of paragraph 3, the first sentence of paragraph 6, the last sentence of paragraph 8, the second sentence of paragraph 12, along with the first sentence of paragraph 21, and the last clause of paragraphs 19, and 20 as containing improper argument and lacking in evidentiary support. In addition, the Court strikes the last clause of paragraph 5, the first two sentences of paragraph 8, the last sentence of paragraph 12,

---

[10] Defendant DeVries joined the motion. (R. 417-1; 419-1.)

[11] Plaintiff's statement contains two paragraphs numbered 4. Here the Court is referring to the paragraph 4 that is placed before paragraph 3, and which begins: "There is ample indication that the Mayor..."

and paragraphs 7, 10, 16, 18, and 22 as unsupported by admissible evidence and/or the record provided to the Court.

## III.    Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776, 167 L. Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Liberty Lobby*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)). A nonmoving party must, however, present more than a scintilla of evidence in support of its claim. *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005). Rather, to overcome summary judgment, the nonmoving party must present "evidence on which the jury could reasonably find for the nonmoving party." *Id.* at 612.

## IV.    Facts

### A.    Individuals

From 1999 to 2003, Plaintiff John LaFlamboy, Sr. and Defendant Allan Gustafson co-owned an inflatable dome structure called the World Golf Dome ("WGD"), which was located in the Village of Bridgeview, Illinois. (R. 373-1 at ¶ 1.) Plaintiff and Gustafson entered into an agreement whereby with each owned a 50% interest in the WGD. (R. 364-3 at ¶ 7.) Plaintiff and Gustafson never reduced their agreement to writing. (*Id.* at ¶ 10.) The WGD employed a number of individuals, including John LaFlamboy, Jr., (R. 373-1 at ¶ 10) and Donna O'Connell. (*Id.* at ¶ 12.) In addition, Defendant Kenneth DeVries leased a bar and restaurant on the WGD premises.

Defendant Steven Landek was (and remains) the mayor of the Village of Bridgeview. (*Id.* at ¶ 5.) At times relevant to this case, Defendant John Curry served as the Village's Code Enforcement Inspector and had the power to issue citations and enforce violations of Village ordinances. (*Id.* at ¶ 120.) Defendant Joseph Kaput was the Village's Director of Buildings and Inspectional Services. (*Id.* at ¶¶ 15; 121.) Defendant Forrest Sloan served as a Village Police Commander. (*Id.* at ¶ 122.) Defendant Vincent Cainkar is an outside attorney who was hired by the Mayor to serve as counsel for the Village to draft legal documents and correspondence for the Village. (R. 406-1 at ¶ 2.) Defendant Steve Reynolds worked for the Village as an independent contractor, working first to ensure compliance with the local liquor laws, and later in the public works department. (R. 373-1 at ¶ 116.) Defendant Adriana Mazutis was Steve Reynold's girlfriend, and her name appears on an agreement transferring ownership of the WGD. Defendant Fred Pascente was Reynold's friend, and accompanied Reynolds at the WGD on September 12, 2003. (*Id.* at ¶ 63.)

**B.     The Opening of the World Golf Dome**

The WGD facility opened in November 1999, offering an indoor driving range and all-season space for sporting events. In addition to the Dome, the facility included a brick structure that housed office space and a restaurant. Within one week of being elected in 1999, Mayor Landek met with WGD co-owners Gustafson and LaFlamboy to discuss how the Village could assist business at the WGD. (R. 371-1 at ¶ 5.) Mayor Landek also recommended Defendant DeVries to the Plaintiff. (R. 371-1 at ¶ 2.) DeVries later leased space in the WGD's brick structure and opened a restaurant called the Scoreboard.

At the time of the WGD's opening, on November 12, 1999, Plaintiff obtained from the Village a temporary business license, (R. 343-3, Village Defs.' Ex. 12), and a temporary Certificate of Occupancy. (R. 343-6, Village Defs.' Ex. 69A.) The Certificate of Occupancy states that it is "per letter of intent." (R. 343-6, Village Defs.' Ex. 69A.) The letter of intent, signed by Plaintiff, listed seven open tasks to be completed and required Plaintiff to provide a $60,000 letter of credit to guarantee completion of the listed tasks. (*Id.*) As of November 17, 1999, the Village had not yet received the letter of credit, and so Defendant Curry sent a letter to Plaintiff notifying him that his "business is immediately 'Closed.' After we receive the letter of credit, a new Temporary Certificate of Occupancy Permit will be issued." (R. 343-6, Village Defs.' Ex. 66.) On that same date, November 17, 1999, Defendant Curry issued two Village Citations, Nos. CC-689-201 and CC-689-202, citing Plaintiff for occupying a building without an occupancy permit and for operating a business without a business permit. (R. 343-6, Village Defs.' Ex. 66.) The next day, November 18, 1999, Plaintiff sent a letter to Defendant Curry confirming that the $60,000 letter of credit had been delivered to Curry on November 18, 1999 at 2:30 pm and requesting that the Village issue a new Temporary Certificate of Occupancy. (R.

14

343-6, Village Defs.' Ex. 69.) The Village issued another Temporary Certificate of Occupancy on November 19, 1999 subject to the same stipulations in Plaintiff's November 12 letter of intent. (R. 373-1 at ¶ 22.)

Defendant Curry denied Plaintiff's business license application on December 14, 1999, citing "insufficient parking." (*Id.*) The parties agree that Village Zoning Ordinance 98-08 required that the WGD maintain 150 spaces. (*Id.*) Plaintiff testified, however, that the WGD did, in fact, have 150 spaces when it opened in 1999. (R. 394-1 at ¶ 21.)[12] When Plaintiff's tenant, Defendant DeVries, later applied for a business license on April 6, 2000, his application stated that The Scoreboard (part of the WGD facility) had 250 parking spaces. (*Id.* at ¶ 21.) The Village granted DeVries' request for a business license. (*Id.*)

### C. Village Citations

Plaintiff alleges the Village Defendants engaged in a pattern of issuing overzealous and/or wrongful citations in order to harass him into selling the WGD. In addition to the November 17, 1999 citation, for example, the Village issued a December 8, 2001 citation for failing to obtain a proper business license. (*Id.* at ¶ 22.) When the citation issued, the Village placed a sticker on the door of the WGD. (*Id.* at ¶ 23.) Plaintiff removed the sticker from the WGD door and received yet another citation for unlawfully defacing a Village of Bridgeview sticker. (*Id.*) Plaintiff also complained that, after the December 8, 2001 citation issued, Village police officers sought to drive away WGD customers. (*Id.*)

In another instance, the Village issued another citation to the WGD on September 24, 2000 for permitting weeds to grow too high. (*Id.* at ¶ 24.) Plaintiff does not deny that the weeds

---

[12] Neither party produced documentary evidence, such as photographs.

were too high but notes that he cut the weeds and the citation was dismissed. (*Id.*) Plaintiff also points to the testimony of Village police officer Kenneth Keyser regarding an incident in which Defendant Sloan asked Keyser to "take a ride down to the golf dome and issue a citation for tall weeds," which Keyser claims he refused because he "was uncomfortable issuing a citation for something that I don't normally issue citations for." (*Id.*) The Village Defendants do not dispute this testimony but note that Keyser also testified that the citation—for tall weeds—was warranted.

The Village also issued citations to Plaintiff on October 14, 2000 and April 27, 2001 for serving food without a permit. (*Id.* at ¶ 25.) The October 14, 2000 citation resulted from a pizza business serving food in the WGD during a haunted house event. (*Id.*) The Village issued the April 27, 2001 citation when a third-party organization hosted an event for disabled children at the WGD. (*Id.*) Plaintiff testified that the organization ordered pizzas to be delivered to the WGD and Defendant Curry arrived shortly thereafter and "started screaming at them they can't eat pizza." (*Id.*)

In another incident, a Village police officer issued a citation to Plaintiff for disobeying a police order, namely dumping truckloads of stone in the WGD parking lot after being ordered not to do so. (*Id.* at ¶ 26.) According to Plaintiff, Defendant Curry sent Plaintiff a letter notifying him that the WGD parking lot had eroded and requesting that Plaintiff add additional stone to the area. (*Id.*) Plaintiff complains that he ordered the stone, but when it was delivered, the police arrived and inexplicably told him not to dump the stone. (*Id.*) Plaintiff admits that he dumped the stone after being told by the police not to do so. (*Id.*)

On December 14, 2000, the WGD received four citations, for: (1) storing combustible materials; (2) maintaining fuel fire heaters without permission; (3) possessing heating devices which failed to comply with standards; and (4) inadequate ventilation. (*Id.* at ¶ 27.) Plaintiff admits the underlying grounds for which the December 14 citations were issued. (*Id.* at ¶ 27, 28.) On July 21, 2001, the Village issued Defendant Allan Gustafson a citation for a faulty security fence around the WGD. (*Id.* at ¶ 29.) Gustafson also received, on July 31, 2001, a citation for maintaining debris on the WGD premises. (*Id.*)

The Village dismissed all citations issued to Plaintiff, Defendant Gustafson, and the WGD between 1999 and 2001 either because the citation amount was paid, or because Plaintiff demonstrated that he had corrected the underlying issue. No citations were dismissed based on any judicial finding that the citation was unfounded. Plaintiff presented some evidence, however, that Village officials used their "power to issue or deny residents a license or permit to do business—for the purpose of forcing businesses to turn over income or property to Mayor Landek and his allies." Plaintiff offered no evidence, however, that Mayor Landek instructed Curry or Kaput regarding the issuance of citations to the WGD.

### D. Special Events at the WGD

Plaintiff also alleges that the Village Defendants repeatedly blocked Plaintiff's attempts to make money through non-sporting events at the WGD. The WGD also hosted some 4500 members of the public at the "Tattoo the Earth Concert" on July 26, 2000. (R. 373-1 at ¶¶ 35, 36; R. 364-3 at ¶ 13.) Prior to the concert, on June 21, 2000, Mayor Landek sent a letter to Plaintiff stating that he had not yet met his conditions of occupancy, as stated in Plaintiff's November 12, 1999 letter of intent, and that it would be "extremely difficult" for Plaintiff to

complete the tasks before the event.  (R. 373-1 at ¶ 114.)  Plaintiff did not obtain a special use permit for the "Tattoo the Earth" concert.  (*Id.* at ¶ 41.)  Despite the concerns expressed in Landek's letter, and despite the fact that the Village contended that the WGD had neither an occupancy permit nor a business license, the concert was not cancelled.

An agreement between Plaintiff, Defendant DeVries, and the concert's promoters governed the proceeds of the "Tattoo the Earth" concert.  This contract required the WGD to donate a portion of the concert revenue as a "political donation."  (*Id.* at ¶ 42.)  Plaintiff asserts that the donation was meant for Mayor Landek as a kickback.  Specifically, Plaintiff testified that Defendant DeVries told Plaintiff that he should pay the kickback if he wanted to stay in business, (R. 434-1, Pl.'s Ex. 76A; R. 344-2, Village Defs.' Ex. 173), and that when Plaintiff complained to Mayor Landek soon thereafter, the Mayor did not deny the kickback.  (R. 434-1, Pl.'s Ex. 61; 76A.)  Plaintiff has admitted, however, that he did not personally see Mayor Landek receive revenues from the concert.  (R. 373-1 at ¶ 43.)  Two days after the concert, Plaintiff contacted federal prosecutors and the Federal Bureau of Investigation regarding the alleged illegal conduct by Village officials.  (R. 364-3 at ¶ 13.)

Plaintiff planned another event—a public dance called the "Boogie Tribe Dance Party"—at the WGD for late August 2000.  On or about August 9, 2000, Defendant Cainkar sent a letter to Plaintiff expressing the Village's concerns regarding possible zone violations relating to the party.  (R. 373-1 at ¶ 45).  When Plaintiff failed to seek a special one-day temporary use permit from the Village, Defendant Cainkar, the Village's attorney, sought a temporary restraining order against Plaintiff.  (R. 373-1 at ¶¶ 45-46).  Plaintiff agreed to the injunction, and he cancelled the party.  *Id.*

In December 2000, Mayor Landek arranged for the WGD to host a Christmas party for the Bridgeview bank. (R. 373-1 at ¶ 5.) Neither party submitted evidence as to (1) whether the Village issued a special one-day temporary use permit for the event; (2) how many people attended the event; or (3) whether food was served at the event.

### E.     Fall 2000 Appraisal

Plaintiff further claims that as part of the scheme to gain control of the WGD, Mayor Landek ordered an appraisal of the WGD without notifying Plaintiff. In late fall 2000, Plaintiff met with Mayor Landek in Landek's office. The parties disagree as to the specific substance of the conversation, but Landek testified that at some point during the conversation, Landek asked Plaintiff how much he would accept for the WGD. Landek testified that Plaintiff stated, "$3 million." Landek also testified that the conversation was "just in passing." (R. 373-1 at ¶ 113.)

At some point thereafter, Landek asked Defendant Cainkar, then the Village's attorney, to get an appraisal of the WGD. (*Id*.) On October 5, 2000, Defendant Cainkar sent a facsimile to Thomas Holcer requesting that Holcer appraise the WGD. The facsimile states in part,

> The Village of Bridgeview is investigating the possibility of purchasing the World Golf Dome...We don't need a full blown appraisal, and one of the owners doesn't know that the Village is interested, so you can't say anything. What is happening is that the majority owner is sick and tired of the publicity and wants to sell out. I believe the number mentioned was $1,400,000 but it might go down to $1,250,000.

(R. 406-1 at ¶ 4; R. 434-1, Pl.'s Ex. 111.) The resulting appraisal is dated November 1, 2000. (R. 373-1 at ¶ 113; R. 406-1 at ¶ 4; R. 346-7, Village Defs. Ex. 347.) Neither party disputes that Plaintiff  was not immediately made aware of the Village obtaining an appraisal of the WGD in the fall of 2000.

On May 30, 2002, Defendant Cainkar sent a facsimile to Mayor Landek, stating in part,

> The appraiser called me late yesterday and provided information regarding new golf dome just constructed at the Green Gardens Golf Course in Frankfort, IL. Of course the golf dome was constructed by our friend from Bridgeview... A rough cost for the facility would be $1,600,000. The appraisal from Tom Holcer 2 years ago was $1,200,000 to $1,500,000 so this is pretty consistent.

(R. 434-1, Pl.'s Ex. 111.) On that same day, Thomas E. Holcer sent a fax to Defendant Cainkar stating, "I was informed this morning that the life expectancy of a golf dome structure is 25 to 30 years." (*Id.*) In addition, a facsimile dated June 18, 2002 from Landek to Plaintiff states in part, "John – attached is the appraisal for the golf dome we discussed." (*Id.*) This document also has a facsimile transmission report attached, however, indicating that the fax did not go through to Plaintiff. (*Id.*)

### F. "Bogus Lawsuits"

During the 1999-2003 time period, Plaintiff and Defendant Gustafson were named in a number of lawsuits. Plaintiff has alleged that the Village Defendants instructed individuals to file "bogus lawsuits" against Plaintiff and the WGD. Plaintiff has not, however, put forward any admissible evidence of such conduct. Nor has Plaintiff put forward evidence showing that Mayor Landek was involved in any lawsuits brought by DeVries against Plaintiff or the WGD.

### G. Inspections

In March of 2003, Plaintiff hired structural engineer Gerald Carstens of GRC Engineering to inspect the WGD and report back to the Village, for the purpose of assisting Plaintiff in obtaining a building permit to repair the WGD. (R. 373-1 at ¶ 58.) Carstens sent a letter to Defendant Kaput reporting his findings. (*Id.*) Carstens testified that after sending the report to the Village, he spoke to Kaput by phone, and Kaput requested that Carstens prepare an additional report for the Village. According to Carstens, he agreed to prepare the report as long

as his findings were his own.  (*Id.*)  Kaput replied that he "wanted to close the WGD down, and that [Carstens'] report was to facilitate such purpose ."  (*Id.*)

At some point thereafter, Kaput engaged a third party engineering firm, Varga & Associates, to review the Carstens inspection.  (R. 373-1 at ¶ 58.)  Varga requested additional information from Kaput at least once.  (R. 345-5, Village Defs. Ex. 220.)  Varga, Kaput, and Defendants Curry and Sloan conducted an inspection of the WGD on March 27, 2003 in Plaintiff's presence, and Varga submitted his report on March 31, 2003.  (*Id.*)  The parties' submissions do not make clear what happened in the intervening months, but on June 24, 2003, Defendant Kaput sent a letter to Plaintiff noting three areas "that Mr. Varga deemed necessary to complete the project."  (*Id.*)  Plaintiff claims that the March inspection was a "foreordained condemnation" of the WGD.

### H.     The Chicago Fire

Plaintiff alleges that one motive for the Village Defendants' scheme to defraud him of his interest in the WGD was that Mayor Landek wanted the WGD to improve Bridgeview's chances of winning a bid to host the Chicago Fire, a Major League Soccer team.  Sometime in 2003, the owners of the Chicago Fire considered the Village of Bridgeview as a potential location in which to relocate their soccer team.  (R. 373-1 at ¶ 104.)  In connection with their search for a home for the Fire, the team owners issued requests for proposals ("RFPs") from various municipalities, including Bridgeview.  (*Id.*)  Ultimately, the team owners and the Village entered into a thirty-year agreement providing that the Fire would play all of its home games in Bridgeview.  (*Id.* at ¶ 105.)  This agreement does not require the Village to provide an all-weather practice facility, such as the WGD, for the team.  (*Id.*)  Nor has the Fire ever practiced at the WGD.  (*Id.*)

Plaintiff did, however, provide evidence that in August of 2003, Mayor Landek told Bridgeview Police Chief Charles Chigas that he wanted to acquire the WGD "at all cost" in order to "guarantee" that the Chicago Fire would choose Bridgeview. (Pl.'s Ex. 44, Eldridge Aff. at ¶ 4.)

## I.     Transfer of the WGD

### 1.     Meetings between Gustafson and various Defendants

In late July 2003, Defendant Gustafson began discussing a potential sale of his interest in the WGD with Defendant Reynolds. (R. 364-3 at ¶ 33.) Gustafson testified that he told Reynolds at their first meeting that Plaintiff owned a 50% interest in the WGD. (*Id.*) Gustafson also testified that Plaintiff attended at least one meeting with Gustafson and Reynolds, but that during that meeting, Gustafson refused Reynolds' offer of $1.2 million. (R. 350-2, Gustafson's Ex. F at 112:17-113:11.) In a subsequent meeting with Reynolds, unattended by Plaintiff, Gustafson agreed to sell his interest in the WGD to Adriana Mazutis for $1.25 million. (*Id.* at 114:6-115:21.) This meeting took place right after Labor Day, 2003. (*Id.*)

On the morning of September 11, 2003, Defendant Gustafson met with Defendants Landek, Cainkar, and Reynolds in Landek's office. (R. 364-3 at ¶ 46.) At the meeting, Reynolds indicated that he knew both of the WGD partners, Plaintiff and Defendant Gustafson, and could facilitate the Village's purchase of the WGD by acquiring both interests and reselling the property to the Village. (*Id.*) Landek asked Cainkar, the Village's attorney, to prepare the documents necessary for the transfer of the WGD, because, according to Cainkar, Landek "wanted to get things moving." (R. 406-1 at ¶ 2; R. 364-3 at ¶ 46.) At that same meeting, Reynolds agreed to secure the corporate documents necessary to allow Cainkar to draft the transfer documents. (R. 364-3 at ¶ 46.)

Later that same day, pursuant to the instructions of Defendant Cainkar, Defendants Gustafson and Reynolds traveled together to the office of Tom Morrison, the attorney who held the corporate books for the WGD. (R. 350-2, Gustafson's Ex. F at 121:15-124:1.) Morrison was not in the office and so Gustafson left a note with Morrison, instructing him to turn the WGD corporate books over to Reynolds later that day. (R. 364-3.) Reynolds signed a receipt indicating that he had received "the corporate records of World Golf Dome, Inc., and an unsigned copy of agreement for sale of business with real estate (World Golf Dome), as authorized by Allan Gustafson, this 11th Day of September, 2003." (*Id.*; R. 350-2, Gustafson's Ex. Y.)

Also on September 11, 2003, Cainkar sent a facsimile to Defendant Landek enclosing the "first draft" of a settlement agreement, and asking Landek:

> I would appreciate if you would review the Agreement to see if I have left anything out (highly unlikely). Because this is such a rush maybe there is something that I don't know about. If the Agreement is acceptable, then I would recommend that copies be signed by Gustafson first. Then it should be taken over to LaFlamboy so that he can sign the Agreement, the stock transfer, and the assignment of beneficial interest. I will prepare those documents so that they can be picked up tomorrow morning.

(R. 434-1, Pl.'s Ex. 111(a).) Cainkar did not speak with LaFlamboy before drafting this agreement, and Cainkar did not represent either Gustafson or LaFlamboy in preparing the document. (R. 406-1 at ¶ 2.)

### 2. The Events of September 12, 2003

On September 12, 2003, Plaintiff's girlfriend, Donna O'Connell, went to the WGD office on an errand for Plaintiff. (R. 406-1 at ¶ 9.[13]) O'Connell testified that the WGD was closed, but

---

[13] Having difficulty wading through the parties' disorganized exhibits, the Court requested a complete copy of the O'Connell deposition that supported the paragraphs cited above and separately filed this deposition to preserve it in the record.

when she arrived, she saw two men leaving the WGD office, one carrying a plaque from Plaintiff's office. (*Id.*) One of the men, Defendant Reynolds, questioned her in an intimidating manner and pushed her. (*Id.*) The two men, Defendants Pascente and Reynolds, told her that they were interested in purchasing Plaintiff's share of the WGD and demanded that she call Plaintiff. (*Id.*; R. 373-1 at ¶ 63.) The parties dispute what happened next, but all agree that O'Connell called the Village Police Department, that Village police officers arrived on the scene, and that the police left within twenty minutes of arriving. (R. 406-1 at ¶ 9; R. 373-1 at ¶ 64, 65.)

After the police left, O'Connell testified that Reynolds showed her some documents that included Defendant Gustafson's name, and asked her to call Plaintiff again. (R. 406-1 at ¶ 9.) O'Connell testified that, at one point, a vehicle pulled up carrying two people whom she recognized as Village employees, and that Defendant Reynolds handed the plaque to one of them. (*Id.*) At some point, O'Connell testified, Reynolds began talking about Mayor Landek. O'Connell does not recall exactly what was said, but she asked Reynolds to call Mayor Landek, and Reynolds placed the call. (*Id.*) O'Connell spoke briefly to Landek on Reynolds' cell phone and recognized Landek's voice. (*Id.*) O'Connell testified that Reynolds was on the phone "back and forth" throughout their encounter, although, with the exception of her brief call with Mayor Landek, she did not know to whom Reynolds spoke. (*Id.*)

According to O'Connell, she sat in Reynold's car with Reynolds and Pascente for approximately two and a half hours as the three waited for Plaintiff to drive in from a far west suburb. (*Id.*) O'Connell also stated that at one point, Defendant Reynolds pulled a gun from a leg holster and showed it to O'Connell, asking her if the gun would make Plaintiff arrive sooner,

and telling her that Plaintiff "wasn't going to leave there alive if he didn't sign the documents." (*Id.*)

Once Plaintiff arrived, O'Connell told him, "he's (Reynold's) got a gun. Be careful." Plaintiff agreed to go into the WGD office with Defendants Reynolds and Pascente. (*Id.*) The parties dispute what happened in the next twenty minutes, but during that time, Plaintiff apparently agreed to sell the WGD for $175,000. (*Id.*) At some point that day, LaFlamboy signed a one-page agreement for the sale of the WGD to "Steve Reynolds in good faith" ("the September 12 Settlement Agreement"). (R. 345-7, Village Defs.' Ex. 268 at 2220G.) According to the terms of the September 12 Settlement Agreement, LaFlamboy agreed to transfer his interest in the WGD in exchange for $175,000 and release from all liabilities related to the WGD. (*Id.*) The September 12 Settlement Agreement was signed by LaFlamboy as the "seller" and Pascente—not Reynolds—as the "buyer." (*Id.*) By its terms, the September 12 Agreement was contingent on the execution of a formal contract no later than September 16. (*Id.*)

Immediately following the encounter with Pascente and Reynolds, Plaintiff called his attorney, Ken Thiesen, and instructed him to draft a purchase agreement concerning the sale of the WGD. (R. 373-1 at ¶ 71.) Thiesen testified that Plaintiff's voice gave him reason to believe that something was wrong. Thiesen asked Plaintiff if he felt threatened, and Plaintiff told Thiesen that he did. (R. 373-1 at ¶ 71.) Thiesen prepared the document. That same day, September 12, Thiesen drafted a formal purchase agreement ("Purchase Agreement") transferring LaFlamboy's interest in the WGD to Fred Pascente in exchange for $175,000 and a release from all WGD liabilities. (R. 345-7, Village Defs.' Ex. 268 at JL00043-00050.) It is undisputed that both LaFlamboy and Pascente signed the Purchase Agreement. According to its

terms, the Purchase Agreement was contingent upon several conditions being satisfied prior to the closing, which was scheduled for two days later, on September 14.

Viewed in the light most favorable to Plaintiff, the evidence suggests that LaFlamboy signed the Purchase Agreement only because he was coerced to do so. Within ten days of the September 12 incident, however, Plaintiff requested the $175,000 payment from Steve Reynolds on three separate occasions. (R. 373-1 at ¶ 82.) Moreover, when Reynolds and Pascente failed to pay Plaintiff the $175,000 specified in the Purchase Agreement, Plaintiff instructed his attorney to place a lien on the WGD. (*Id.*) On October 24, 2004, Plaintiff filed a lien on the WGD claiming a right to compensation in the amount of $175,000. (*Id.*)

### 3.    The September 15, 2003 Settlement Agreement

On September 15, 2003, Defendant Gustafson met with Defendant Reynolds at a Bridgeview bank and signed a document titled Settlement Agreement Between Alan Gustafson and John LaFlamboy Concerning the World Golf Dome ("the September 15 Agreement"), (R. 345-7, Village Defs.' Ex. 269). The document purports to contain both Gustafson's and LaFlamboy's signatures, although LaFlamboy disputes that the signature is his. (R. 406-1 at ¶ 1.) According to the terms of the September 15, 2003 Agreement, LaFlamboy transferred his share of the WGD to his business partner, Gustafson, in return for forgiveness of debts and liabilities of the WGD corporation, including, but not limited to, one or more bank loans and additional loans made to the corporation by Gustafson. (R. 345-7, Village Defs.' Ex. 269; R. 373-1 at ¶¶ 53, 61, 68.) The parties do not dispute that the September 15 Agreement is the agreement drafted by Defendant Cainkar on September 11, 2003 and faxed to Mayor Landek. (*See, e.g.,* R. 364-3 at ¶ 46, 52; R. 406-1 at  ¶ 2.) LaFlamboy did not personally witness the alleged forgery,

and has presented no evidence that Defendants Landek, Sloan, Curry, Cainkar, or Gustafson personally forged the document. According to Gustafson, the September 15 Agreement already included Plaintiff's signature when Gustafson signed the document. (R. 364-3 at ¶ 60.) Gustafson maintains that the September 15 Agreement transferred Plaintiff's 50% interest in the WGD to Gustafson. (*Id.*)

### 4.      Mazutis Agreement

At the same September 15, 2003 meeting, Defendant Gustafson executed a handwritten contract purporting to transfer Gustafson's 100-percent ownership interest in the WGD to Adriana Mazutis in exchange for $1,250,000. (R. 406-1 at ¶ 13; R. 346-7, Village Defs.' Ex. 357;  R. 356-1, Gustafson's Ex. DD.)

On September 18, 2003, Defendant Cainkar faxed Thomas Holcer a request for an appraisal of the World Gold Dome. The facsimile states in part:

> On November 6, 2000, you prepared a Limited Scope Market Value Appraisal for the above property [the WGD] showing a range of market value from $1,200,000 to $1,500,000. The Village needs this updated as talks are serious with a purchase price in the range of $1,600,000. Of course, if the Village owns the property, it will be exempt from real estate taxes and make its operation more profitable. I would appreciate if you could put a rush on this...

(R. 434-1, Pl.'s Ex. 111.) The parties have not submitted any resulting appraisal.

Beginning on September 24, 2003, Defendant Cainkar sent at least four separate facsimiles to attorney Stephen H. Dabrowski, requesting at various points, "a written agreement with Alan Gustafson for the purchase of the World Golf Dome," and "any type of agreement that your client has entered into with Gustafson." On October 22, 2003, Cainkar's facsimile provided:

> In order to facilitate the closing and with the permission of the Mayor, I would suggest that your client assign its agreement to purchase the World Golf Dome property to the Village. The Village would then close on the purchase at the same price that your client is paying as a result of the assignment. This should minimize the complaints that someone is making a profit other than the current owners. Then the difference between the amount which would be paid by the Village to your client and the amount paid at the Gustafson closing would then be paid when all of the title matters, including the lawsuits are dismissed. This would put the onus on your client to resolve these matters before getting paid and would protect the Village.

(Pl.'s Ex. 111(a).) Viewing the facts in a light most favorable to Plaintiff, Mr. Dabrowski represented both Defendant Adriana Mazutis and Defendant Reynolds in connection with the transfer of the WGD. (R. 395-1 at ¶ 47; R. 346-7, Village Defendants' Exs. 355; 356.)

On October 31, 2003, the Village of Bridgeview entered into an agreement with Mazutis, whereby the Village purchased the WGD from Mazutis for a total cost of $1,650,000. (R. 406-1 at ¶ 13.) The agreement contains signatures purporting to belong to Mayor Landek and Ms. Mazutis. (*Id*.) Under this agreement, Ms. Mazutis assigned her 100-percent interest in the WGD to the Village for a net gain of $242,366.97, with the Village paying $1.2 million to Defendant Gustafson. (*Id*.) The Village subsequently issued two checks to Ms. Mazutis totaling $142,366.97. (*Id*.) In addition, the Village had previously issued a check to Mazutis on August 20, 2003 for $100,000. (*Id*.)

Ms. Mazutis testified, however, that she did not receive any checks from the Village of Bridgeview and that she never received any money from the Village in connection with the WGD. (R. 406-1 at ¶ 13.) Ms. Mazutis also testified that she does not recall ever meeting Mr. Gustafson, she does not recall signing an agreement to purchase the WGD, that she had never been inside the WGD, and that prior to September 15, 2003, she had never spoken to anybody with the Village about purchasing the WGD. (*Id*.) Ms. Mazutis did testify, however, that it was

common for her boyfriend, Defendant Reynolds, to give her documents to sign, and that she would sign the documents without first reading them. (*Id*.) The Village Defendants claim that "[a]ll of the evidence indicates that Mazutis and/or Reynolds received $242,367, which was properly accounted for and disclosed." (R. 373-1 at ¶ 18.) Defendants have not provided any evidence confirming who received the $242,367, what this amount represented, or how it was "properly accounted for and disclosed."

### 5.     November 6, 2003 Letter

On November 6, 2003, Village Attorney Cainkar sent Plaintiff's attorney a letter that states:

> As you are aware, I an the attorney for the Village of Bridgeview which is interested in purchasing the above property. At this time I do not know what if any interest your client, John LaFlamboy, has in the property, but I do know that he has filed a document entitled Purchase Agreement Lien.
>
> Be advised that the Village is not using any physical pressure on your client and if such pressure is being exerted, then it is being made without Village authorization and knowledge. If your client is required to sign any document, I will require that the document be signed before a notary public or before an attorney. If you advise me in writing that any document signed by your client is not a valid document, then the Village will treat the same as invalid.
>
> If a voluntary sale of the above property cannot be accomplished, then the Village can simply file an eminent domain action and let a court sort out the interests of all the parties.

(R. 373-1 at ¶ 83; R. 346-1, Village Defs.' Ex. 296.) At the time he received Cainkar's letter, Plaintiff's attorney understood Cainkar to be referring to the agreement with Pascente signed by Plaintiff on September 12, 2003. (R. 373-1 at ¶ 84; R. 346-1, Village Defs.' Ex. 297.) Plaintiff's attorney sent Plaintiff a copy of Cainkar's letter. Plaintiff never responded to Mr. Cainkar's letter, nor did he instruct his attorney to do so. (*Id*.)

Defendant Gustafson closed on the sale of his interest in the WGD to the Village on November 26, 2003 for $1.2 million.  (R. 364-3 at ¶ 67; R. 356-1, Gustafson's Ex. DD.)  Neither party disputes that the Village of Bridgeview currently owns the WGD.  In addition, the parties do not dispute that LaFlamboy received no money from any of the various transactions.

## ANALYSIS

Four summary judgment motions are pending before the Court.  The Village Defendants have moved on Counts I, II, and III.  (R. 363-1.)  Defendant DeVries has moved on Counts II and V.  (R. 369-1.)  In addition, Defendant Cainkar separately moves for summary judgment as to Counts II and III (R. 381-1); Defendant Gustafson moves for summary judgment as to Counts II, III, and IV (R. 364-1; 366-1).  Defendants Pascente, Reynolds, and Mazutis did not move for summary judgment as to the Counts asserted against them.[14]  The Court addresses each Count in turn.

## I.    RICO Claims – Count I

Plaintiff brings Count I under the Civil RICO statute, 18 U.S.C. § 1964(c), which provides civil remedies to a person "injured in his business or property by reason of a violation" of the criminal RICO statutes.  18 U.S.C. § 1964(c); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453, 126 S. Ct. 1991, 1994, 164 L. Ed.2d 720 (2006).  Specifically, 18 U.S.C. § 1962(c) makes it a crime for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To establish a civil RICO claim, Plaintiff must prove the

---

[14] Plaintiff currently asserts Counts I, II, and III against Pascente and Reynolds, and Counts II and III against Mazutis.

following elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2137-38, 170 L. Ed.2d 1012 (2008); *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006).

Plaintiff asserts that the Village Defendants[15] violated Section 1962(c) by conducting the Village's (the charged RICO enterprise) affairs through a pattern of racketeering activity, including mail fraud, official misconduct, and various other crimes. Specifically, Plaintiff alleges sixty-three separate racketeering acts. Excluding acts allegedly committed by Defendants Allan Gustafson, Kenneth DeVries, Vincent Cainkar, and Adriana Mazutis, Steven Reynolds, and Fred Pascente, (*see* Notes 1 and 2, *supra*), Plaintiff alleges thirty separate racketeering acts committed by the Village Defendants.

The Village Defendants have challenged Plaintiff's Section 1962(c) claim on seven independent grounds. First, the Village Defendants argue that employees acting on behalf of municipal corporations cannot be held liable under RICO. Second, Defendants argue that many of Plaintiff's alleged "predicate acts" either do not constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1) or lack evidentiary support. As such, Defendants argue that Plaintiff cannot show that Defendants committed a "pattern" of racketeering activity. Third, Defendants argue that the predicate acts taken as a whole fail to create a pattern of racketeering activity. Fourth, Defendants contend that Plaintiff ratified the WGD transaction and has thus has waived his right to claim damages. Fifth, Defendants assert that Plaintiff cannot establish that he was proximately injured by Defendants' conduct. Sixth, Defendants argue that Plaintiff lacks

---

[15] As noted above, Plaintiff has also alleged a 1962(c) claim against Defendants Reynolds and Pascente, but because they have not moved for summary judgment, the Court focuses its 1962(c) analysis on the allegations against the Village Defendants.

standing to recover for losses incurred by the WGD.  Finally, Defendants Curry, Kaput, and

Sloan contend that they did not "operate or manage" the enterprise.

### A.      Standing

Although Defendants raise the issue of standing toward the end of their brief, standing is

a jurisdictional requirement that the Court must consider before reaching the merits of Plaintiff's

RICO claim.  *See Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006) (RICO standing

"represents a jurisdictional requirement which remains open to review at all stages of the

litigation") (citation omitted).

Defendants allege that Plaintiff lacks standing because he alleges harm on behalf of the

WGD corporation.  "Where the shareholder's injury resulted directly from an injury to the

corporation, but only indirectly from the harm the wrongdoer wreaked upon the corporation, the

RICO claim belongs to the corporation, and not the shareholder."  *Gagan v. American*

*Cablevision, Inc.*, 77 F.3d 951, 959 (7th Cir. 1996) (citing *Sears v. Likens*, 912 F.2d 889, 892

(7th Cir. 1990) ("Shareholders of a corporation do not have standing as individuals to bring a

RICO action for diminution in the value of their stock caused allegedly by racketeering activities

conducted against the corporation"); *Flynn v. Merrick*, 881 F.2d 446, 449 (7th Cir. 1989);

*Rylewicz v. Beaton Servs., Ltd.*, 888 F.2d 1175, 1178-79 (7th Cir. 1989)).

In each of the cases cited in *Gagan*, the racketeering acts directly harmed the corporation

and only indirectly harmed the shareholders—who suffered harm by virtue of diminished share

value.  *Sears* involved minority shareholders alleging that racketeering acts committed against

the corporation diminished the value of their stock.  *Sears,* 912 F.2d at 891.  In *Flynn*,

shareholders complained that corporate assets were sold at unfair prices.  *Flynn*, 881 F.2d at 448.

*Rylewicz* involved a third party engaging in racketeering acts to force a corporation to settle a lawsuit. *Rylewicz*, 888 F.2d at 1179.

In this case, however, Plaintiff alleges direct harm to his business and property interest. Although Plaintiff alleges harm to the WGD corporation in lost business, he also alleges that his interest in the WGD was sold out from under him. Unlike the plaintiffs in the *Sears* line of cases, he is not merely alleging injury to the corporation based on inadequate compensation in the transfer, but rather that he was individually singled out and swindled. Indeed, the WGD corporation itself may have lost nothing in the transfer of its real estate assets as one of the owners received $1.2 million in compensation. *See, e.g., Joyce v. Morgan Stanley & Co., Inc.*, 538 F.3d 797, 800 (7th Cir. 2008) (finding direct injury where shareholders alleged harm caused by actions of third parties and not by injury to corporation).

Plaintiff's case is more analogous to *Gagan* than to the *Sears* line of cases. In *Gagan*, the Seventh Circuit found that a limited partner had standing to recover on a RICO claim where Gagan, "not the limited partnership, was injured by the conspiracy to sell the limited partnership's assets and divert the proceeds from the sale" and "the limited partnership's assets were sold and the partnership dissolved at the time Gagan brought suit." *Gagan*, 77 F.3d at 960. To begin with, Plaintiff was not merely a shareholder of the WGD corporation but rather a 50% owner, along with Plaintiff Gustafson, of a closely-held corporation. As discussed in Section IV, below, Illinois courts treat such 50% shareholders as *de facto* partnerships. *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 -1219 (7th Cir. 1995); *Illinois Rockford Corp. v. Kulp*, 41 Ill.2d 215, 222, 242 N.E.2d 228, 233 (1968); *Hagshenas v. Gaylord*, 199 Ill. App.3d 60, 145 Ill. Dec. 546, 552, 557 N.E.2d 316, 323 (1990). In addition, the parties do not dispute that one of the

50% partners, Gustafson, received $1.2 million for his interest in the WGD while the Plaintiff received nothing. By the time Plaintiff brought suit, the WGD corporation's real estate assets had been sold and the corporation itself dissolved. The policy behind the shareholder standing rule, as the Seventh Circuit has noted, is to "prevent individuals from securing a double recovery—one directly as an individual and another indirectly as a shareholder of the corporation." *Gagan*, 77 F.3d at 959. As was the case in *Gagan*, Plaintiff's claims do not implicate these concerns—the corporation was compensated for its sale. Only Plaintiff suffered injury. Plaintiff's measure of damages is, at the very least, his share of the sale of the WGD.

In addition, to the extent that Plaintiff alleges lost business arising from special events at the WGD, the parties did not provide facts sufficient to consider these injuries. First, it is not clear whether the special events at the WGD were WGD corporation events or Plaintiff's own events. Defendant Gustafson appears to deny any involvement with these events, thus suggesting that these events were not part of the WGD corporation. (*See* R. 364-3 at ¶¶ 13, 18, 20.) To the extent that these events were not affiliated with the WGD corporation but rather Plaintiff personally, then Plaintiff may have suffered additional damages based on loss of business.

**B.     RICO "Person"**

The Village Defendants also argue that because municipal corporations cannot be held liable under RICO, *see Lancaster Cnty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404-05 (9th Cir. 1991),[16] Village employees escape RICO liability for acts undertaken on behalf

_____

[16] *See Genty v. Resolution Trust Corp.*, 937 F.2d 899, 914 (3d Cir. 1991) ("[T]he prevailing punitive nature of section 1964(c)'s compulsory award of treble damages convinces us that Congress, in keeping with the common law, did not intend to subject municipal corporations to RICO liability..."); *Lathrop v. Juneau & Assocs.*, 220 F.R.D. 330, 335 (S.D. Ill.

of the Village.  Persuasive authority supports Defendants' argument.  *See Lathrop*, 220 F.R.D. at 335 ("Because the City of Granite City cannot be held liable under RICO for the reasons stated above, the suit against the government officials in their 'official capacity' also cannot be maintained.");  *Frooks*, 997 F. Supp. at 457 ("[B]ecause the Town cannot be held liable under RICO as a matter of law, neither may the Town employees in their official capacities."); *Rini v. Zwirn*, 886 F. Supp. 270, 295 (E.D.N.Y. 1995) ("[S]ince the municipality cannot be held liable for the acts of its agents, the Town employees, in their official capacity, cannot be held liable under RICO.").  Indeed, "official capacity" suits are merely a way of pleading an action against a municipality that cannot be held liable under a *respondent superior* theory.  *See Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361, 116 L. Ed.2d 301 (1991); *see also Ky. v. Graham*,  473 U.S. 159, 165, 105 S. Ct. 3099, 3104, 87 L. Ed.2d 114 (1985), ("a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.").

Even accepting that the Village Defendants cannot be held liable in their official capacities, however, Defendants' argument is not dispositive because Plaintiff also pursues his claim against the Village Defendants in their individual capacities.  Plaintiff, for example, asserts that the Village Defendants acted "for the personal, pecuniary, and political benefit of themselves and others who supported defendant Landek."  (R. 299-1, Fourth Am. Compl. ¶¶ 16, 18.)  In addition, public officials can be held individually liable for actions taken while holding public office and/or misuse of their public office.  *See, e.g., United States v. Warner*, 498 F.3d 666, 696 (7th Cir. 2007) (affirming RICO conviction of former Illinois governor based on

2004); *Pelfresne v. Village of Rosemont*, 22 F. Supp. 2d 756, 761 (N.D. Ill. 1998); *see also Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 457 (S.D.N.Y. 1998) (collecting cases); *see also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 261-62, 69 L. Ed.2d 616, 101 S. Ct. 2748 (1981) (suggesting that municipalities are incapable of committing malicious or criminal acts).

activities defendant was serving as Illinois Secretary of State and Governor); *United States v. Emond*, 935 F.2d 1511, 1512 (7th Cir. 1991) (affirming RICO conviction of village manager who "used his official position as Streamwood's village manager to extort money from persons with business before the village government.").[17]

## C.     RICO Enterprise

Defendants do not dispute that the Village may be an enterprise for the purposes of RICO.  A municipality or other public entity may qualify as a RICO enterprise.  *See Emond*, 935 F.2d at 1512 (finding Village of Streamwood to be RICO enterprise); *see, e.g.*, *Warner*, 498 F.3d at 696 (State of Illinois was a RICO enterprise); *United States v. Balzano*, 916 F.2d 1273, 1290 (7th Cir. 1990) (Chicago Fire Department was a RICO enterprise); *United States v. Murphy*, 768 F.2d 1518, 1531 (7th Cir. 1985) (Circuit Court of Cook County was a RICO enterprise); *United States v. Lee Stoller Enters., Inc.*, 652 F.2d 1313, 1318-19 (7th Cir. 1981) (sheriff's office was a RICO enterprise).

## D.     Racketeering Activity/Predicate Acts

Defendants next argue that Plaintiff cannot prove sufficient predicate acts to amount to a pattern of racketeering activity.  "Racketeering activity," as defined by 18 U.S.C. § 1961(1), includes a host of state and federal offenses, or predicate acts.  18 U.S.C. § 1961(1)(A) lists the state law felony offenses that qualify as "racketeering activity," such as robbery, bribery, extortion.  Section § 1961(1)(B) enumerates the federal law violations that constitute

_____

[17]  Indeed, as discussed below, the Seventh Circuit has held that certain violations of Illinois' Official Misconduct Statute, specifically, 720 ILCS 5/33-3(d), which applies to misconduct committed while in office, can constitute a RICO predicate act.  *See United States v. Garner*, 837 F.2d 1404, 1419 (7th Cir. 1987); *see also United States v. Genova*, 333 F.3d 750, 758 (7th Cir. 2003) (720 ILCS 5/33-3(d) "defines a species of bribery" and thus violations constitute predicate acts for RICO purposes; violations of 720 ILCS 5/33-3(c), however, do not).

"racketeering activity." Under § 1961(1)(B), for example, racketeering activity includes, among other crimes, mail and wire fraud, and obstruction of justice. *See* 18 U.S.C. § 1961(1)(B). To establish a "pattern" under RICO, Plaintiff must prove at least two offenses, or predicate acts. *Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 801-802 (7th Cir. 2008) (citing *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 250, 109 S. Ct. 2893, 106 L. Ed.2d 195 (1989)).

The predicate acts alleged against the Village Defendants group into four categories: (1) Official Misconduct; (2) Mail Fraud; (3) Obstruction of Justice; and (4) "Payrolling." As discussed below, Plaintiff has failed to establish a genuine issue of material fact as to some of these purported racketeering acts. Viewing the evidence in the light most favorable to Plaintiff, however, he has established a genuine issue of material fact as to at least two acts of racketeering activity for the Village Defendants. The law is clear that a "pattern" of racketeering requires "at least two predicate acts each with its own essential elements." *RWB Servs., LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 686 (7th Cir. 2008); *see also* 18 U.S.C. § 1961(5).

### 1. Official Misconduct

Twenty-one of the racketeering acts identified by Plaintiff—Racketeering Acts 1, 5, 7(a),(c), 8, 10, 18, 19, 20, 22, and 24-35—allege that one or more of the Village Defendants engaged in official misconduct in violation of Illinois law, namely Illinois' Official Misconduct

statute, 720 ILCS 5/33-3.[18]  All but one of these fail as a matter of law to establish racketeering activity under RICO.

Under 18 U.S.C. § 1961(1)(A), state law violations that sound in bribery or extortion, such as Illinois' Official Misconduct statute, constitute RICO predicate acts.  Not every violation of Illinois's Official Misconduct statute, however, entails bribery or extortion.  In *United States v. Garner*, 837 F.2d 1404, 1419 (7th Cir. 1987), for example, the Seventh Circuit held that a violation of 720 ILCS 5/33-3(d) "falls comfortably within the generic classification of bribery." But the Seventh Circuit has also held that subsection (c) of the same statute "does not read like a definition of bribery and therefore may not be used as a predicate offense under RICO."  *United States v. Genova*, 333 F.3d 750, 758 (7th Cir. 2003).  Accordingly, the question becomes whether Plaintiff's allegations rely on subsection (c) or subsection (d) of 720 ILCS 5/33-3.

Although Plaintiff's allegations do not cite to a subsection of the Official Misconduct statute, it is clear when viewing the evidence in the light most favorable to Plaintiff that Racketeering Acts 5, 7(a), 7(c), 8, 10, 18, 19, 20, 22, and 24-35 (in Plaintiff's FAC) do not rely on 720 ILCS 5/33(d), because those Racketeering Acts are unrelated to assertions that any

---

[18] The Official Misconduct Statute states:

Official Misconduct. A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts:
(a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or
(b) Knowingly performs an act which he knows he is forbidden by law to perform; or
(c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or
(d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law...

720 ILCS 5/33-3.

Defendant "solicit[ed] or knowingly accept[ed] for the performance of any act a fee or reward which he knows is not authorized by law." *See* 720 ILCS 5/33(d). Rather, each of these Racketeering Acts alleges that Defendants "knowingly performed acts … in excess of [their] lawful authority," thereby invoking 720 ILCS 5/33(c). (*See, e.g.,* R. 299-1, Fourth Am. Compl. ¶¶ 42(a); 44(a); 44(c); 45; 47; 55; 56; 59(a).) Moreover, the facts underlying these assertions, as presented in this motion, pertain to 720 ILCS 5/33(c). While such acts may violate subsection (c) of the Official Misconduct statute, they do not relate to bribery, and therefore do not qualify as predicate acts under 18 U.S.C. § 1961(A). *See Genova*, 333 F.3d at 758.

With regard to Racketeering Act 1, however, Plaintiff's allegations and the facts presented fairly read as alleging a violation of both 720 ILCS 5/33(c) and (d). To the extent that Plaintiff can establish bribery pursuant to 720 ILCS 5/33(d), Racketeering Act 1 survives. Contrary to Defendants' arguments, Plaintiff offered evidence sufficient to create a genuine issue of material fact as to whether the Mayor accepted a kickback—a portion of the proceeds from the "Tattoo the Earth Concert"—in exchange for ignoring code violations. Plaintiff testified that Defendant DeVries told him that the money was going to the Mayor. At the end of the concert, Plaintiff was present when DeVries got the money intended for the Mayor. Plaintiff subsequently confronted the Mayor about the payment, and the Mayor did not deny receiving it. Defendants' evidence to the contrary merely established an alternate version of the events. Plaintiff's evidence creates an issue of fact. Whether he can prove the payment is up to the jury.

### 2. Mail Fraud

Plaintiff alleges that Defendants committed both traditional money and property mail fraud and honest services mail fraud. The mail fraud statute, 18 U.S.C. § 1341, prohibits the use

of the mails for carrying out a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008). Mail fraud "occurs whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.'" *Id.* (quoting 18 U.S.C. § 1341). As the Supreme Court noted in *Phoenix Bond,* "[t]he gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element...even if the mailing itself contains no false information." *Phoenix Bond*, 128 S. Ct. at 2138 (citation and internal quotation marks omitted); *see also United States v. Useni*, 516 F.3d 634, 648 (7th Cir. 2008). In addition, § 1346 adds to the definition of a "scheme or artifice to defraud" any "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In order to establish that the scheme or artifice to defraud involved the deprivation of the intangible right to honest services, pursuant to 18 U.S.C. § 1346, Plaintiff must prove misuse of position (such as a public office) for private gain. *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008).

Plaintiff premises nine of the racketeering acts relating to the Village Defendants on mail fraud: Acts 2-4, 9, 11, 17, 21, 23, and 47. Plaintiff claims that the schemes at issue defrauded him of both property (the World Golf Dome), pursuant to 18 U.S.C. § 1341, and honest services, pursuant to 18 U.S.C. § 1346. The mailings offered by Plaintiff in furtherance of mail fraud include: (1) Landek's June 12, 2000 letter to Plaintiff in connection with the "Tattoo the Earth Concert" (Racketeering Act 2); (2) Cainkar's August 9, 2000 letter regarding the "Boogie Tribe Dance Party" (Racketeering Act 3); (3) a November 1, 2000 letter requesting an appraisal of the

WGD from Thomas Holcer (Racketeering Act 4); (4) an October 22, 2003 letter to Mazutis' attorney offering to buy the WGD (Racketeering Act 9); (5) Cainkar's November 6, 2003 letter to Plaintiff's attorney; (6) Curry's November 17, 1999 letter to Plaintiff (Racketeering Act 17); (7) Kaput's June 24, 2003 letter to Plaintiff (Racketeering Acts 21 and 60); and (8) a September 10, 2003 letter from Defendant Reynolds to Defendant Gustafson's attorney.

As an initial matter, Racketeering Acts 4 and 9 fail for the reason that Plaintiff cannot establish a mailing. Racketeering Act 4 relies on a letter dated November 1, 2000 allegedly requesting an appraisal, but Plaintiff has failed to establish that any such letter exists. To the extent Plaintiff meant to refer to an October 5 facsimile transmission concerning the same request (as suggested by Defendants), however, a facsimile transmission invokes wire, not mail fraud. *See, e.g., South Chicago Bank v. Notary*, Case No. 90 C 6357, 1991 WL 21185, *4 (N.D. Ill. Feb. 12, 1991) ("Neither a messenger delivery, nor an intrastate facsimile transmission constitutes an actionable predicate act under RICO."). In addition, as Holcer & Company is located in Oakbrook, Illinois, (*see* R. 346-7, Village Defs.' Ex. 347 at VC00107), there is no evidence to suggest that the October 5 facsimile meets the requisite element of the wire fraud statute that a transmission be sent across state lines. *See* 18 U.S.C. § 1373; *Arenson v. Whitehall Convalescent and Nursing Home, Inc*., 880 F. Supp. 1202, 1212 (N.D. Ill. 1995). Similarly, Racketeering Act 9 references a mailing, but the only October 22, 2003 document offered is another intrastate facsimile transmission. (*See* R. 346-7, Village Defs.' Ex. 356 at VC03000.)

As to the remaining mailings, the Village Defendants argue that none of the mailings are fraudulent and thus cannot support mail fraud. "Routine and innocent mailings," however, "can support mail fraud." *Shapo v. O'Shaughnessy*, 246 F. Supp.2d 935, 957 (N.D. Ill. 2002)

(quoting *United States v. Brocksmith*, 991 F.2d 1363, 1368 (7th Cir. 1993)).  A mailing need not

contain false or misleading information, *United States v. Hickok*, 77 F.3d 992, 1005 (7th Cir.

1996),  nor cause loss on its own.  *Brocksmith*, 991 F.2d at 1368.  To support mail fraud,

mailings "only need to be in furtherance of the scheme."  *Shapo,* 246 F. Supp.2d at 957.

Accordingly, the Village Defendant's primary argument, that mail fraud cannot be based on

Defendants' mailings that contain no misrepresentations, fails as a matter of law.

　　　　Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has offered

evidence of at least two mailings in furtherance of a scheme to defraud.  Plaintiff's evidence

creates a material issue of fact as to whether the Village Defendants schemed to purchase the

WGD either for Landeks' benefit (or the benefit of Defendants Reynolds and/or Mazutis) or to

improve the Village's chances of securing the Chicago Fire, to his own personal political benefit.

Plaintiff also points to a series of letters mailed or caused to be mailed by one or more of the

Village Defendants that, when viewed in a light most favorable to the Plaintiff, create a question

of fact as to whether the Village Defendants engaged in a scheme to deprive Plaintiff—via

inconsistent and/or unfair application and enforcement of Village ordinances—of his property

interest in the WGD.  Finally, questions remain whether special events held at the WGD were

WGD corporation events or Plaintiff's events.  If they were Plaintiff's events, then further issues

of fact remain as to whether the Village Defendants' schemes deprived Plaintiff of profits arising

from these events.

　　　　Plaintiff has also submitted evidence—when viewed in the light most favorable to him,

as the Court must do at this stage—that the Mayor may have been involved in, or even directed,

Defendant Reynolds' intimidating Plaintiff into signing over the WGD, to the financial benefit of

Ms. Mazutis or Mr. Reynolds and the Village, as well.  Not only did Plaintiff offer evidence that the Mayor spoke with Reynolds by phone during the September 12, 2003 encounter, but Landek admits to having met with Reynolds, Gustafson, and Cainkar the day before to discuss the transfer of the WGD.  It was during that meeting, according to Defendant Cainkar, that the Mayor instructed Cainkar to prepare the September 15, 2003 settlement agreement for which Plaintiff has submitted evidence of forgery.  Following the "execution" of this agreement, Cainkar sent at least one letter—to Plaintiff's counsel—that could reasonably be seen as an attempt to legitimize the Village's purchase of the WGD.  *See Brocksmith*, 991 F.2d at 1367-68 (mail fraud proven by "[u]se of the mails to lull victims into a false sense of security...even if it occurs after the money has been fraudulently obtained.)  None of the Defendants dispute that any of these letters were sent via United States Mail, nor do Defendants paint a clear picture of when, why, and how the WGD changed hands.

Defendants also seem to argue that since the WGD corporation was in debt at the time of the WGD's transfer, Plaintiff has not been deprived of money or property.  Setting aside that these debts were arguably corporate debts rather than Plaintiff's debts, and setting aside that Plaintiff has created a genuine issue of fact as to the fair market value of the WGD and the value of his 50% share, Defendants ignore the import of Plaintiff's honest services claim.  Specifically, Plaintiff may still prevail by showing that the Village Defendants—all employees of the Village of Bridgeview—misused their positions for private gain.  *See Sorich*, 523 F.3d at 708-709.  As Plaintiff has offered evidence that the Village Defendants misused their positions, as discussed above, it is enough that Plaintiff offered evidence that the scheme would permit someone to profit to the tune of $242,366.97.  *See id.*  "A participant in a scheme to defraud is guilty even if

he is an altruist and all the benefits of the fraud accrue to other participants." *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005). "For that matter, neither the scheme to defraud, nor the conspiracy, has to succeed in inflicting harm for the participants to be guilty." *Id.* (citations omitted).

The Village Defendants also claim that Plaintiff failed to establish forgery of the September 15, 2003 agreement because Plaintiff did not witness the forgery. But simply because Plaintiff was not present for the alleged forgery does not establish that the signature is authentic. It is Defendants' burden on summary judgment to establish that there is no material question as to whether a forgery occurred, and Defendants have failed to meet their burden. First, Defendants point to an unauthenticated expert report—inadmissible hearsay on summary judgment—as their only evidence that the signatures on the September 15 Settlement Agreement are authentic. Second, Defendants argue that Plaintiff's affidavit is self-serving and therefore inadmissible. This is a stretch. *Paz v. Wauconda Healthcare and Rehab. Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006) ("evidence presented in a 'self-serving' affidavit or deposition is enough to thwart a summary judgment motion."). There is no party better positioned to testify as to whether Plaintiff signed the September 15, 2003 agreement than Plaintiff himself. The Seventh Circuit has repeatedly held that "a nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion." *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) (collecting cases).[19]

### 3. Obstruction of Justice

---

[19] Plaintiff's affidavit also contained information that was argumentative and/or not clearly based on Plaintiff's personal knowledge, and accordingly, the Court disregarded those portions of Plaintiff's Affidavit.

In Racketeering Act 7(b), Plaintiff alleges that Defendant Landek obstructed justice in violation of 18 U.S.C. §§ 1503 and 1512.  Although crimes under these statutes constitute "racketeering activity" under RICO, 18 U.S.C. § 1961(1)(B), Plaintiff fails to articulate any theory as to how Defendants obstructed justice.  Sections 1503 and 1512 are criminal statutes relating to proceedings in federal court.  *See United States v. Regina*, 504 F. Supp. 629, 631 (D. Md. 1980) (Section 1503 applies only to proceedings in front of Article III Courts and not to Article I courts or state superior courts); 18 U.S.C. § 1515(a) (defining "official proceeding" for purposes of § 1512 to include Article III judges, federal magistrates, bankruptcy judges, Tax Court judges, Federal Claims judges, and federal grand juries).  Plaintiff made no attempt, however, to present evidence that Defendants interfered with any federal proceedings.  *See* 18 U.S.C. § 1503 (influencing or injuring an officer or juror of "any court of the United States"); 18 U.S.C. § 1512(g) (relating to tampering with a witness in an "official proceeding" before a federal tribunal, or tampering with federal government employees).  Accordingly, Plaintiff has failed to establish a question of fact as to Racketeering Act 7(b).

### 4. **"Payrolling"**

Racketeering Act 6 alleges that Mayor Landek engaged in "payrolling" Steven Reynolds. Whatever bad act Plaintiff sought to convey with the phrase "payrolling," it is not a predicate act under RICO.  *See* 18 U.S.C. 1961(1)(A)-(B) (cataloging the types of crimes which constitute "racketeering activity .")  This predicate act fails as a matter of law.

### E. **Pattern of Activity**

The RICO statute defines a "pattern of racketeering activity" as "at least two acts of racketeering activity" committed within a ten-year time period, 18 U.S.C. § 1961(5); *Roger*

*Whitmore's Auto. Servs.*, 424 F.3d at 670, that are related and "amount to or pose a threat of continued criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006) *(*quoting *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1002 (7th Cir. 2004); *see also H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed.2d 195 (1989)). As discussed above, Plaintiff has created a question of fact as to whether the Village Defendants committed at least one act of bribery and two acts of mail fraud. Accordingly, the Court must examine whether the alleged predicate acts meet the "continuity plus relationship" test: "the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992)).

### 1. Relationship between the predicate acts

The relationship prong of the "continuity plus relationship" test "requires that the predicate acts be 'committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct.'" *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 779 (7th Cir. 1994) (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 972-73). Here, the alleged predicate acts in furtherance of a scheme to defraud Plaintiff are sufficiently related. Each allegation of mail fraud involved a letter sent to Plaintiff or his counsel, and each supported an attempt to misuse Village power to run Plaintiff out of business, force him to sell his interest, or deprive him of the Village officials' honest services. In addition, the allegation of bribery involved Mayor Landek using his position of authority to extract a kickback in exchange

for allowing the "Tattoo the Earth" concert to proceed in spite of a prohibitory Village ordinance.

### 2. Continuity among the predicate acts

The continuity prong is "both a closed- and open-ended concept." *Midwest Grinding,* 976 at 1022 (citing *H.J.,* 492 U.S. at 241, 109 S. Ct. at 2902). Plaintiff here alleges a "closed-ended" period of racketeering activity, for which Plaintiff must prove "a series of related predicates enduring a substantial period of time." *Id.* (quotation omitted). The alleged predicate acts continued from November 1999, when Plaintiff opened the WGD, to at least the end of 2003. Plaintiff offered evidence of multiple schemes designed to bleed money from his special events, each of which caused a separate harm to Plaintiff. In addition, Plaintiff alleged a scheme to deprive him of his 50% interest in the sale of the WGD through intimidation and forgery.

Defendants argue that there is insufficient continuity because the scheme injured Plaintiff alone. The Seventh Circuit has warned, however, that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975–976 (7th Cir. 1986). Regardless, Plaintiff's evidence of honest services mail fraud support harm that victimized the people of Bridgeview. Accordingly, Defendants have failed to demonstrate that no issue of fact remains for trial.

### F.     Causation

The Village Defendants next argue that they cannot be liable under RICO because they did not cause Plaintiff's alleged injury. The issue of causation is closely related to the issue of standing, and as noted above, Plaintiff's evidence of direct, personal harm to his business and

property interest support RICO standing.  Defendants wrongly characterize "the transfer of his former one-half interest in the WGD, by his co-owner, Gustafson" as the sole injury alleged by Plaintiff.  (R. 365-1, Defs.' Mot. at 34.)  Plaintiff asserts other injuries—including loss of Mayor the Village Defendants' honest services and the loss of business resulting from Defendants' practice of issuing citations and otherwise improperly shutting down the special events Plaintiff hosted.

Even still, as noted above, Defendants have not established that there is no genuine issue of fact regarding the authenticity of the September 15, 2003 Agreement purporting to be between Plaintiff and Defendant Gustafson.  To the extent that Plaintiff alleges that the Village Defendants forged the document, then Plaintiff also alleges a connection between Gustafson and the Village Defendants that resulted in direct injury to Plaintiff.  After all, Plaintiff has created a genuine issue of fact as to whether Gustafson and the Village plotted together on September 11, 2003—just four days before the September 15 agreement was allegedly forged.  The Village Defendants made no attempt whatsoever to explain how the confusing series of questionable transactions in the Fall of 2003 effected the transfer of the WGD to the Village.  As so many questions remain as to what happened, when, to whom, why, and how, the Village Defendants simply have not met their burden on summary judgment.

### G.    Ratification

The Village Defendants' remaining argument, that Plaintiff ratified the September 12, 2003 agreement, is unavailing because it relies on the September 12, 2003 Agreement with Pascente.  The Village Defendants have failed to establish that the September 12, 2003 Agreement transferred anything, much less the WGD.  Defendants contend that Plaintiff ratified

the September 12 Agreement, which transferred nothing, but then claim that Plaintiff's interest was somehow transferred to Defendant Gustafson through the later September 15 Agreement. Defendants' attempts to explain the series of transactions have failed at the summary judgment stage.

### H.    Curry, Kaput, and Sloan

Although Plaintiff alleged that Defendant Sloan committed official misconduct, the official misconduct allegations against Sloan do not constitute RICO predicate acts, as noted above in Section I.D.1, above.  In addition, Plaintiff has not alleged that Sloan participated in the mail fraud schemes against him—Plaintiff's evidence against Sloan focuses solely on the alleged official misconduct.  Sloan's conduct may be relevant to Plaintiff's RICO conspiracy claim, as alleged in Count II, but Plaintiff simply has not put forth sufficient evidence as to Sloan on Count I.  Consequently, the Court grants summary judgment on Count I as to Defendant Sloan.

As to Defendants Curry and Kaput, however, this argument fails.  Questions of fact still remain as to whether Curry and Kaput committed predicate acts supported by Plaintiff at this stage.  Plaintiff provided factual support for at least two predicate acts involving each of these Defendants.  *See Limestone Dev. Corp. v. Village of Lemont*, 473 F. Supp.2d 858, 873 (N.D. Ill. 2007), *aff'd,* 520 F.3d 797 (7th Cir. 2008) ("In alleging a RICO pattern, liability is limited to persons who have 'personally committed' at least two predicate acts of racketeering.").

Finally, the Village Defendants contend that Curry and Kaput did not participate in or have any control over the operation and management of the Village.  The precedent cited by the Village Defendants, however, does not support their argument.  *See MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 978 (7th Cir. 1995) ("*Reves* itself observes that

lower-rung participants under the direction of upper management may 'operate' a racketeering enterprise.") (citing *Reves*, 507 U.S. 170, 184, 113 S. Ct., 1163, 1173, 122 L. Ed.2d 525 (1993)). Based on the facts currently before the Court, questions of fact still remain as to whether Defendants Curry and Kaput—all insiders—participated under the direction of upper management, and thus participated in the operation or management of the Village. Each served in a high-level Village supervisory position, associated themselves with the Mayor, and possibly with the alleged scheming against Plaintiff. Accordingly, questions of fact remain as to whether Curry and Kaput themselves constitute upper management that exerted "some degree of direction" over the enterprise. *U.S. v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005) (citing *Reves*, 507 U.S. at 178, 113 S. Ct. 1163).

## II.     RICO Conspiracy – Count II

"To be convicted of conspiracy under § 1962(d), one must knowingly agree to facilitate the activities of those who are operating an enterprise." *Useni*, 516 F.3d at 646. "It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005). Although there must be an agreement between the members of the conspiracy, direct evidence need not be shown since an agreement can be inferred from the circumstances. *Useni*, 516 F.3d at 646. "[M]ere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions is not sufficient to convict a person of conspiracy." *Id.* It must be shown that Defendant was aware of the essential nature and scope of the enterprise and intended to participate in it. *Id.*

The Village Defendants argue only that because Plaintiff has failed to establish a violation of § 1962(c), his § 1962(d) claim—which he bases on the same facts as his § 1962(c) claim—also fails. *See, e.g.*, *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000) (citing *Midwest Grinding*, 976 F.2d at 1026). As Plaintiff's Count I survives, the Court rejects this argument.

Plaintiff has also created a question of fact as to whether DeVries' involvement in the "Tattoo the Earth" concert constitutes facilitation of the alleged enterprise. In addition, the parties do not dispute that the Mayor not only knew DeVries prior to DeVries signing the lease with the WGD, but also that he recommended DeVries to the Plaintiff, even before the lease was signed. (R. 370-1, DeVries' Br. at 6.)

As to Defendant Cainkar, Plaintiff's evidence supports at least two instances of mail fraud in which Defendant Cainkar personally participated. Although Defendant Cainkar's position as an outsider precludes liability under § 1962(c), as this Court previously ruled, (*see* R. 101-1), his involvement does not, at this time, allow summary judgment in his favor on the § 1962(d) conspiracy claim. Nor is Defendant Cainkar's statute of limitations argument dispositive, because the acts in which Defendant Cainkar is alleged of engaging occurred in 2003—well within the limitations period.

Further, to the extent that Defendant Cainkar claims that his absolute and qualified immunity affirmative defenses apply to Count II, that argument is not successful. Although local legislators are absolutely immune from suit, *Bogan v. Scott-Harris*, 523 U.S. 44, 49, 118 S. Ct. 966, 970, 140 L. Ed.2d 79 (1998), Cainkar is not a local legislator. He argues that "officials outside the legislative branch are entitled to legislative immunity when they perform legislative

functions," *Id.* at 55; 118 S. Ct. at 973, but there is no evidence that Cainkar actually performed any legislative functions— or "integral steps in the legislative process." *Id.* Cainkar offers no evidence that he introduced, voted for, or signed legislation. Indeed, Cainkar admitted that he was not involved in the Village Board's deliberations regarding whether to purchase the WGD. (R. 395-1 at ¶ 31.) To the extent that Cainkar argues that his actions in obtaining appraisals, drafting agreements and correspondence were in furtherance of a legislative directive, (R. 359-1, Cainkar's Br. at 11), Cainkar's actions would, at best, be analogous to a prosecutor investigating a case. But "[a] prosecutor is shielded by absolute immunity when he acts 'as an advocate for the State' but not when his acts are investigative and unrelated to the preparation and initiation of judicial proceedings." *See Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S. Ct. 2606, 2615-16, 125 L. Ed. 2d 209 (1993)).

Nor has Cainkar established an entitlement to qualified immunity as to Count II. "Qualified immunity is a defense available to **government** officials performing discretionary functions that affords them protection from civil liability." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008) (emphasis added) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982)). Cainkar fails to identify any binding authority finding a private attorney immune to a civil RICO action. Cainkar cites *Richardson v. McKnight*, 521 U.S. 399, 117 S. Ct. 2100, 138 L. Ed.2d 540 (1997) for the proposition that "[p]rivately retained attorneys who perform traditional governmental functions are entitled to assert qualified immunity." (R. 359-1, Cainkar's Br. at 13.) But *Richardson* actually held that the private prison guards subject to a 42 U.S.C. § 1983 action were not entitled to immunity, and in doing so, refused to find that merely performing a function traditionally reserved for the government justifies immunity for private

individuals. *Richardson*, 521 U.S. at 408-409, 117 S. Ct. at 2106. "Indeed, a purely functional approach bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities, ranging from electricity production, to waste disposal, to even mail delivery." *Id.* Even if Cainkar offered authority granting private attorneys qualified immunity where they act as agents of a legislature or executive office, as he argues, questions of fact would still remain as to whether Cainkar acted solely as the agent of the Village's legislative board or whether he agreed to assist the RICO conspiracy allegedly led by the Village Defendants—for example, when he drafted the September 15 Settlement Agreement between two individuals that he did not represent.

Defendant Gustafson argues that simply because the Court previously dismissed him from Count I, Plaintiff cannot show that Gustafson violated § 1962(d). (R. 364-2 at 5.) Nothing in the precedent cited by Gustafson suggests that he must personally violate § 1962(c) before he may be found to violate § 1962(d). Conspiracy under § 1962(d) is "an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." *Cummings*, 395 F.3d at 397. Accordingly, a defendant "may conspire to violate § 1962(c) even if that defendant could not be characterized as an operator or manager of a RICO enterprise under *Reves*." *Id.* at 398 (quoting *MCM*, 62 F.3d at 979). In addition, Plaintiff adduced evidence that Gustafson met with multiple Village Defendants just days before signing over his interest in the WGD, accepting payment of $1.2 million when Plaintiff received nothing. Gustafson's evidence at this point does not establish that he had no knowledge of the alleged enterprise.

## III.    Section 1983 Claims – Count III

Plaintiff's Third Count alleges a constitutional tort under two theories: first, Plaintiff alleges a takings claim, specifically that the Village deprived Plaintiff of his right "not to have his property taken for purported public use without just compensation," (R. 299-1, Fourth Am. Compl. ¶90); and second, Plaintiff asserts that Defendants violated his right "not to be deprived of his property or his livelihood without due process of law." (*Id.* at ¶ 90.) To state a constitutional claim under 42 U.S.C. § 1983, Plaintiff must allege that a government official (1) acting under color of state law, (2) deprived him of a right secured by the Constitution or the laws of the United States. *Christensen v. County of Boone, IL*, 483 F.3d 454, 459 (7th Cir. 2007).

## A.     Just Compensation/Takings Claim

Plaintiff first asserts violation of his Fifth Amendment right to just compensation. (R. 299-1, Fourth Am. Compl. at ¶¶ 19, 34-35, 92-94.) The Fifth Amendment does not prohibit the government from taking property but rather "proscribes taking without just compensation." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson County*, 473 U.S. 172, 194 (1985); *Peters v. Clifton*, 498 F.3d 727, 731 (7th Cir. 2007). In *Williamson County*, "the Supreme Court articulated a special ripeness doctrine for constitutional property rights claims which precluded federal courts from adjudicating land use disputes until: (1) the regulatory agency has had an opportunity to make a considered definitive decision, and (2) the property owner exhausts available state remedies for compensation." *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). As Judge Posner has explained, the government does not commit a constitutional tort until it refuses to pay:

> When, as alleged in this case, the government (a town in Illinois) takes the
> property without a condemnation proceeding, the owner must, if the government

refuses to pay, file a suit in state court—what is called an 'inverse condemnation' suit—to obtain the compensation due him, and he must exhaust his state judicial remedies, if necessary by appealing an adverse decision. He must proceed in that way because unless and until the state courts turn him down, his right to just compensation has not been infringed.

*Rockstead v. City of Crystal Lake*, 486 F.3d 963, 965 (7th Cir. 2007) (citations omitted). Thus, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until he has used the procedure and been denied just compensation." *Williamson County*, 473 U.S. at 194; *Clifton*, 498 F.3d at 732; *see also Rockstead*, 486 F.3d at 965.

Without addressing the merits of the claim, Defendants argue that Plaintiff's Fifth Amendment claim is not ripe for federal adjudication because Plaintiff failed to exhaust his state remedies pursuant to *Williamson County*. In response, Plaintiff cites a decision dealing with ERISA administrative remedies and argues that the Court may entertain Plaintiff's claim "even assuming plaintiff has failed to exhaust his remedies." *See Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 649 (7th Cir. 1996). *Lindemann* is neither applicable nor analogous to the present case. As the Seventh Circuit has made clear, "[district courts have] subject matter jurisdiction over only those takings claims for which the *Williamson County* requirements are satisfied or otherwise excused." *See Patel*, 383 F.3d at 573; *Clifton*, 498 F.3d at 734 ("The Supreme Court has determined, as a matter of law, when federal takings claims are ripe and has set forth a rule in *Williamson County* that this court is bound to follow.").[20]

---

[20] Nor is the argument "dilatory," as Plaintiff suggests. Ripeness is a justiciability doctrine and the question of ripeness may be considered on a court's own motion at any time. *National Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 (2003); *see also Peters*, 498 F.3d at 734 ("The prudential character of the *Williamson County* requirements do not, however, give the lower federal courts license to disregard them...In the absence of compliance with *Williamson County*, the district court

Plaintiff's claim is not ripe for federal adjudication. Plaintiff does not argue that Illinois does not provide an adequate procedure by which he could seek just compensation for the alleged taking of his property, *see Williamson County*, 473 U.S. at 195; *Patel v. City of Chicago*, 383 F.3d 569, 573 (7th Cir. 2004). Nor has Plaintiff argued that Illinois' inverse condemnation procedure is unavailable to him, and until he has utilized that procedure, his takings claim is premature. *Williamson County*, 473 U.S. at 197; *Clifton*, 498 F.3d at 727; *see also Estate of Himelstein v. Ft. Wayne*, 898 F.2d 573, 575 (7th Cir. 1990) (affirming dismissal under *Williamson County* where the City Common Council's refusal to acknowledge the re-zoning of Plaintiff's property allegedly destroyed Plaintiff's "reasonable investment backed expectation."). Instead, Plaintiff merely states that he "has *not* exhausted his remedies since the Village seized the WGD outright without a semblance of adherence to the procedures of eminent domain." (R. 393-1 at 15) (emphasis in original). But this is not the same as arguing that state procedures are inadequate or unavailable—much less establishing a question of fact for trial. Plaintiff has not disputed that he has not utilized—or even attempted to utilize—state procedures to obtain just compensation for Defendants' alleged taking.[21]

Because Plaintiff's takings claim is not yet ripe for review, the Court dismisses it without prejudice for lack of subject matter jurisdiction. As the Court bases this dismissal on its lack of subject matter jurisdiction over this claim, the Court dismisses Plaintiff's takings claim, as to all defendants, without prejudice.

_____

correctly dismissed this action.").

[21] *See Patel*, 383 F.3d at 575 ("[O]nly documentation showing that the Plaintiffs had unsuccessfully attempted to obtain just compensation through the procedures provided by the state for obtaining such compensation would allow us to exercise jurisdiction over the Plaintiffs' claim.").

**B.      Due Process Clause**

Plaintiff's Fourth Amended Complaint also alleges both procedural and substantive due process violations.  First, to the extent that Plaintiff alleges a procedural due process violation, he does not allege an established Village policy that injured his property rights.  Rather, his allegations rest on the actions of the Village Defendants in forcing the transfer of the WGD.  In such circumstances, the Supreme Court has held that "where a loss of property is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure, the state cannot predict when the loss will occur."  *Hudson v. Palmer*, 468 U.S. 517, 532, 104 S. Ct. 3194, 3203, 82 L. Ed.2d 393 (1984).  Accordingly, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."  *Hudson,* 468 U.S. at 533, 104 S. Ct. at  3204; *Doherty v. City of Chicago*, 75 F.3d 318, 323 (7th Cir. 1996).  Applying *Hudson's* holding, the Seventh Circuit requires that "[w]here state law remedies exist, a plaintiff must either avail herself of the remedies guaranteed by state law or demonstrate that the available remedies are inadequate."  *Doherty*, 75 F.3d at 323.  As noted above, Plaintiff has failed to do so here.

Plaintiff also alleges that Defendants violated his Fourteenth Amendment substantive due process rights by depriving him of his property interests.  Substantive due process refers to the concept that "state action which deprives [a person] of life, liberty, or property must have a rational basis—that is to say, the reason for the deprivation may not be so inadequate that the judiciary will characterize it as 'arbitrary.'"  *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008) (quoting *Jeffries v. Turkey Run Consol. Sch. Dist.*, 492 F.2d 1, 3-4 (7th

Cir. 1974) (Stevens, J.). Plaintiff's substantive due process claim does not implicate a fundamental right, such as the right to marry or have children, *Brown v. Michigan City, Ind.*, 462 F.3d 720, 732 (7th Cir. 2006), but rather alleges that the Village infringed on his property interest.

"Once a landowner obtains such a state-created property right, the due process clause of the Fourteenth Amendment circumscribes, but does not eliminate, the government's ability to deprive him of that interest." *Gen. Auto Serv.*, 526 F.3d at 1000. When a substantive due process claim involves only the deprivation of a property interest, the plaintiff must "first establish either an independent constitutional violation or the inadequacy of state remedies to redress the deprivation." *Id.* (citing *Lee*, 330 F.3d at 467); *see also Doherty,* 75 F.3d at 323-26. As noted above, Plaintiff's fifth amendment claim is not yet ripe, and Plaintiff has not even alleged that state remedies are inadequate to address his alleged deprivation. Accordingly, the Court dismisses the remainder of Plaintiff's Count III, without prejudice.

## IV.      Breach of Fiduciary Duty – Count IV

Defendant Allan Gustafson has moved for summary judgment on Count IV, in which Plaintiff alleges that Gustafson breached his fiduciary duty to Plaintiff as his former business partner. Plaintiff failed to respond to Gustafson's motion for summary judgment and, by failing to dispute them, admitted all facts contained within Gustafson's Rule 56.1 statement. Nonetheless, Gustafson, as the moving party, bears the burden of showing "that there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law." *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007); Fed. R. Civ. P. 56(c).

Only after Defendant Gustafson has met his burden does the Court evaluate whether Plaintiff has made a sufficient showing to survive summary judgment. *Id.*

Under Illinois law, the necessary elements of a breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) damages proximately resulting from that breach. *Autotech Tech. L.P. v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (citing *Neade v. Portes*, 193 Ill. 2d 433, 739 N.E.2d 496, 502, 250 Ill. Dec. 733 (2000)). Neither party disputes that Gustafson and Plaintiff were the sole shareholders of the WGD corporation, and under Illinois law, "a shareholder in a close corporation owes a duty of loyalty to the corporation and to the other shareholders." *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 -1219 (7th Cir. 1995) (citing *Hagshenas v. Gaylord*, 199 Ill. App.3d 60, 145 Ill. Dec. 546, 552, 557 N.E.2d 316, 323 (1990), appeal denied, 133 Ill.2d 556, 149 Ill. Dec. 321, 561 N.E.2d 691 (1990)). Illinois courts have long recognized that the shareholder relationship in a closely-held corporation "in many ways resembles a partnership," *Rexford Rand,* 58 F.3d at 1218 -1219, and thus "the mere fact that a business is run as a corporation rather than a partnership does not shield the business venturers from a fiduciary duty similar to that of true partners." *Id.* (quoting *Hagshenas*, 145 Ill. Dec. at 552, 557 N.E.2d at 322); *see also Illinois Rockford Corp. v. Kulp*, 41 Ill.2d 215, 222, 242 N.E.2d 228, 233 (1968) (finding that the "decision to form and operate as a corporation rather than a partnership does not change the fact that they were embarking on a joint enterprise, and their mutual obligations were similar to those of partners.").

As 50% shareholders, Gustafson and Plaintiff were akin to partners, and each had a duty to deal with the "utmost good faith, fairly, honestly, and openly with their fellow stockholders." *Rexford Rand,* 58 F.3d at 1218 -1219 (quoting *In re Dearborn Process Serv., Inc.*, 149 B.R. 872,

880 (Bankr. N.D. Ill. 1993)).  In *Hagenshas,* for example, the court found a breach of fiduciary duty where a shareholder opened a competing business and hired away corporate employees. *Hagenshas*, 145 Ill. Dec. at 552, 557 N.E.2d at 322.   In *Illinois Rockford Corp.,* a 50% shareholder breached his duty to the other 50% shareholder by failing to deal openly and honestly with his "partner."  *Kulp,* 41 Ill.2d at 223, 242 N.E.2d  at 233.  Instead, the defendant in *Kulp* negotiated a better deal for himself in the sale of the corporation as it was on the verge of bankruptcy.  *Id.*

Here, Gustafson cannot avoid his duty to Plaintiff merely because Plaintiff admitted that "Gustafson owed no special duty to the Plaintiff that would prohibit the sale of Gustafson's interest to whomever Gustafson desired."  (R. 364-3 at ¶ 11.)  Plaintiff has presented evidence of Gustafson's dealings with Reynolds—behind Plaintiff's back.  Gustafson testified that he met with both Defendant Reynolds and Plaintiff, but at that meeting, he refused Reynolds' offer of $1.2 million to buy Gustafson's interest.  (*See* R. 350-2; Gustafson's Ex. F at 112:17-113:11.) Gustafson's testimony suggests that he never told Plaintiff about the later deal with Reynolds—$1.25 million for Gustafson's interest in the WGD—nor does Gustafson make clear why he later accepted $1.2 million from the Village.  (R. 364-3 at ¶ 67; R. 356-1, Gustafson's Ex. DD.)  Plaintiff also testified that he was unaware that Gustafson had unilaterally authorized the transfer of the WGD books to Reynolds on September 11, 2003.  (R. 434-1, La Flamboy Ex. 86 at ¶¶ 7-9; R. 350-2; Gustafson's  Ex. Y.)  Moreover, Gustafson signed the September 15, 2003 Agreement without so much as a phone call to his partner of over four years.  Gustafson makes no attempt to show that he kept LaFlamboy informed of his plans to sell the WGD or, at least, his interest therein.  Questions of fact, therefore, remain for trial.

## V.  Breach of Contract Claims – Count V

Defendant DeVries argues that if the Court grants summary judgment as to DeVries on the RICO and Section 1983 claims, the Court should decline to retain jurisdiction over the pendent state law breach of contract claim asserted against him.  Plaintiff did not respond to Defendant DeVries' motion for summary judgment on this point, but the Court has not granted summary judgment as to Plaintiff's RICO claims.  Consequently, this argument is moot.

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment in part on Count I; denies summary judgment as to Count II; grants summary judgment in part on Count III as to all Defendants; and denies summary judgment as to Counts IV and V.  In addition, the Court grants in part and denies in part the Village Defendants' motion to strike.

DATED:   November 20, 2008                    ENTERED

_____
AMY J. ST EVE
United States District Court Judge